STATE OF CONNECTICUT *v.* THOMAS J. MARRA, JR.
(SC 18331)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.

Argued December 9, 2009—officially released March 9, 2010

*Kenneth Paul Fox*, special public defender, with whom was *Frank J. Riccio, Sr.*, for the appellant (defendant).

*Frederick W. Fawcett*, special assistant state's attorney, with whom, on the brief, was *John C. Smriga*, state's attorney, for the appellee (state).

*Edward J. Gavin* and *Richard Emanuel* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

KATZ, J. Following his 1984 conviction for the murder of the victim, Alex Palmieri, and an unsuccessful direct appeal from the judgment of conviction to this court; see *State* v. *Marra*, 222 Conn. 506, 610 A.2d 1113 (1992); the defendant, Thomas Marra (petitioner), filed a petition, pursuant to General Statutes § 54-102kk,[1] requesting DNA testing of certain evidence that had

---

[1] General Statutes § 54-102kk provides: "(a) Notwithstanding any other provision of law governing postconviction relief, any person who was convicted of a crime and sentenced to incarceration may, at any time during the term of such incarceration, file a petition with the sentencing court requesting the DNA testing of any evidence that is in the possession or control of the Division of Criminal Justice, any law enforcement agency, any laboratory or the Superior Court. The petitioner shall state under penalties of perjury that the requested testing is related to the investigation or prosecution that resulted in the petitioner's conviction and that the evidence sought to be tested contains biological evidence.

"(b) After notice to the prosecutorial official and a hearing, the court shall order DNA testing if it finds that:

been introduced by the state in his criminal trial, along with a motion for an order to compel the victim's siblings to provide biological samples suitable for DNA comparison with that evidence. The petitioner now appeals from the trial court's decision denying his petition and motion.[2] The petitioner contends that the trial

"(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing;

"(2) The evidence is still in existence and is capable of being subjected to DNA testing;

"(3) The evidence, or a specific portion of the evidence identified by the petitioner, was never previously subjected to DNA testing, or the testing requested by the petitioner may resolve an issue that was never previously resolved by previous testing; and

"(4) The petition before the Superior Court was filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice.

"(c) After notice to the prosecutorial official and a hearing, the court may order DNA testing if it finds that:

"(1) A reasonable probability exists that the requested testing will produce DNA results which would have altered the verdict or reduced the petitioner's sentence if the results had been available at the prior proceedings leading to the judgment of conviction;

"(2) The evidence is still in existence and is capable of being subjected to DNA testing;

"(3) The evidence, or a specific portion of the evidence identified by the petitioner, was never previously subjected to DNA testing, or the testing requested by the petitioner may resolve an issue that was never previously resolved by previous testing; and

"(4) The petition before the Superior Court was filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice.

"(d) The costs of DNA testing ordered pursuant to this section shall be borne by the state or the petitioner, as the court may order in the interests of justice, except that DNA testing shall not be denied because of the inability of the petitioner to pay the costs of such testing.

"(e) In a proceeding under this section, the petitioner shall have the right to be represented by counsel and, if the petitioner is indigent, the court shall appoint counsel for the petitioner in accordance with section 51-296."

[2] The petitioner appealed from the trial court's decision to the Appellate Court. We thereafter granted the petitioner's motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2. We heard oral argument on the present case the same day that we heard oral argument on *State* v. *Dupigney*, 295 Conn. 50, 988 A.2d 851

court improperly applied the standard under § 54-102kk for assessing whether there was a reasonable probability that exculpatory DNA evidence would have altered the outcome of his trial. In light of our reasoning in the companion case that we decide today, *State* v. *Dupigney*, 295 Conn. 50, 988 A.2d 851 (2010), as to the meaning and proper application of the "reasonable probability" standard of § 54-102kk, as well as the overwhelming evidence of the petitioner's guilt that would be unaffected by any exculpatory DNA test results, we conclude that the trial court properly denied the petition.[3] Accordingly, we affirm the trial court's decision.

The trial court's memorandum of decision denying the petitioner's requested relief, as well as this court's

(2010), which raises the same legal issue as in this case, and which decision we also released today.

[3] The parties and the amicus curiae, the Connecticut Criminal Defense Lawyers Association, also have raised the issue of whether a "nonparty" can be compelled, under § 54-102kk, to produce samples for DNA comparison if such a person declines to provide one voluntarily. We note that there appears to be only a few state level appellate decisions addressing testing of nonparty DNA evidence not already in possession of the state, and those cases arose in the context of statutes expressly conferring such authority postconviction or through application of discovery rules. See *Horton* v. *State*, Maryland Court of Appeals, Docket No. 114 (December 21, 2009) (granting postconviction petition for DNA testing of third party because DNA testing statute expressly grants authority to order "release of biological evidence by a third party"); *In re Jansen*, 444 Mass. 112, 116–17, 826 N.E.2d 186 (2005) (affirming *pretrial* order that nonparty submit to DNA analysis based on state common law and rules of discovery), overruled in part on other grounds by *Commonwealth* v. *Dwyer*, 448 Mass. 122, 140 n.22, 859 N.E.2d 400 (2006); *State* v. *Pratt*, 273 Neb. 817, 825, 733 N.W.2d 868 (2007) (declining to review postconviction order granting subpoena duces tecum to compel nonparty to produce DNA evidence because order was not appealable final judgment); *State* v. *Register*, 308 S.C. 534, 537–38, 419 S.E.2d 771 (1992) (vacating *pretrial* order that nonparty submit to DNA analysis, but suggesting that such order may be valid if it complies with guidelines of fourth amendment to federal constitution). In light of our conclusion, however, that the trial court properly denied the petition for DNA testing of the materials used in the state's criminal case, we need not address whether the court properly denied the accompanying motion to compel the victim's siblings to provide such a sample.

decision affirming the petitioner's criminal conviction, sets forth testimony in the underlying criminal case from which the jury reasonably could have found the following facts. Sometime before February, 1984, the fifteen year old victim had been arrested for certain criminal activities involving the petitioner. The petitioner became concerned that the victim would implicate him in those activities and the petitioner threatened the victim that if he talked to the police he would " 'end up like Paulie Rice,' " who had been murdered in 1983. On February 3, 1984, the petitioner bought an airline ticket for a flight departing for Italy later that same night and gave it to the victim. Although the petitioner drove the victim to the airport, the victim never boarded the flight because he did not want to leave his girlfriend, Tamara Thiel. On February 4, 1984, the ticket was returned to the travel agency and exchanged for two one-way tickets departing for California later that night under the names of "Mr. A. Palmieri and Mrs. A. Palmieri." Those tickets never were used and were returned to the travel agency for a refund sometime between February 4 and February 11, 1984.

On or about February 6, 1984, the petitioner spoke with two associates, Nicholas Byers and Frank Spetrino, and asked Byers to bring the victim to the petitioner's house later that night. When Byers asked why, the petitioner replied: " 'Why don't you help me put [the victim] in a barrel.' " That afternoon, the petitioner rented a van.

Later that evening, Byers drove the victim, Spetrino and Thiel to the petitioner's house. The petitioner, the victim, Byers and Spetrino entered the petitioner's garage, while Thiel remained in the car. *State* v. *Marra,* supra, 222 Conn. 509. In the garage, the petitioner and the victim argued about the victim's refusal to go to Italy. The petitioner handed Spetrino a baseball bat and told Spetrino not to let the victim leave the garage.

Spetrino then struck the victim in the head with the bat. The victim fell and Spetrino hit him with the bat a few more times. The petitioner then said, " 'Let's get him in the refrigerator.' " Id. As Spetrino began to drag the victim toward a full size refrigerator that was located inside the petitioner's garage, the victim began to speak. The petitioner said, " 'Shut up Alex. You didn't go to Italy.' " Id. The petitioner then took the bat and repeatedly struck the victim in the head. The additional blows caused heavy bleeding and brain matter to protrude from the victim's skull, but he remained conscious. The petitioner, Byers and Spetrino then placed the victim into the refrigerator, and the petitioner closed and padlocked the door. Id. The victim began making sounds from inside the refrigerator. The three men loaded the refrigerator into the back of the rented van.

Byers returned to his car, where Thiel had remained, and the two drove back to Spetrino's house. Meanwhile, the petitioner and Spetrino drove the van to a parking area near the Pequonnock River, where the river empties into the harbor in downtown Bridgeport. Id. After making several holes in the refrigerator with an ax, the petitioner and Spetrino slid the refrigerator into the water and watched it float away. Id. The two men later disposed of the bat, the ax and Spetrino's bloody clothes in the water under the Grand Street Bridge in Bridgeport. Byers also disposed of his sneakers, which were "soaked in the victim's blood."

None of the victim's family or friends ever saw or heard from him again after February 6, 1984. In October, 1985, the Bridgeport police interviewed Spetrino concerning the victim's disappearance. As a result of information provided in those interviews during which Spetrino discussed the circumstances of the victim's death and the disposal of his body, the police took soil and wood samples from the petitioner's garage, several of which, upon testing, revealed small traces of human

blood. The police recovered an ax and a bat near the Grand Street Bridge, but disposed of the bat because they did not realize its significance to the case. Although a police dive team searched the Bridgeport harbor for the victim's body and the refrigerator for a period of several months, the divers could locate neither. *State v. Marra*, supra, 222 Conn. 510. In June, 1986, a woman alerted the police that she had found a sneaker and sock containing what appeared to be part of a human foot while walking on a sandbar near Seaside Park in Bridgeport, approximately two nautical miles from where Spetrino said that he and the petitioner had dumped the refrigerator with the victim's body into the water. Tests on the retrieved materials by the state's experts revealed a bloodstain of human origin inside the sneaker, a hair of human Caucasian origin and a bone of human origin belonging to a Caucasian male between the ages of fourteen and fifty. The state's forensic expert determined that further testing of the retrieved materials either was not feasible or would prove to be inconclusive. She also concluded that it was not possible to compare the blood inside the sneaker to the blood in the garage samples.

At trial, Thiel, Byers and Spetrino testified for the state, offering firsthand accounts of the events leading up to, during and following the night of February 6, 1984. The three witnesses also provided testimony in support of the state's contention that the sneaker found in the Bridgeport harbor had belonged to the petitioner, either by identifying the sneaker as being the same type as the one worn by the victim on the night of February 6, 1984, or by describing the sneaker that the victim was wearing that night in a manner consistent with the sneaker that was found. The state also offered testimony relating to the blood traces found in the petitioner's garage.

In his defense, in light of the state's failure to produce either the victim's body or the refrigerator, the petitioner offered evidence in support of his theory that the victim was not dead, but that he had left the country, and that the refrigerator had not been removed from the garage on the night of February 6, 1984.[4] The jury found the petitioner guilty of the victim's murder, and the trial court thereafter rendered judgment in accordance with the verdict, sentencing the petitioner to a term of imprisonment of sixty years. Id., 508.

---

[4] As this court previously noted in *State* v. *Marra*, supra, 222 Conn. 529–30: "Evidence was offered to indicate that the victim had possessed a passport, had relatives in Argentina and had packed his bags prior to his disappearance. Further evidence was offered that the victim was alive on February 11, 1986, five days after his alleged death, and that he had been present at a travel agency and had exchanged airline tickets on that date. In his closing argument, the defendant suggested that the jury could more reasonably find that the victim had traveled to Argentina, rather than that he had been killed by the [petitioner].

"Further, the [petitioner] offered evidence specifically challenging the state's theory that the victim had been placed into a refrigerator and then into the harbor. . . . [Defense witnesses] Ralph Sperrazza, Jr., Dusdavo A. Lopez and Robert P. Valenti . . . each . . . offered evidence tending to counter the state's theory that the victim had been placed in a refrigerator. Sperrazza testified that he had purchased the [petitioner's] home in January, 1986, and that there had been a freezer in the basement of the home. Sperrazza and Lopez provided descriptions of the freezer that were similar to the descriptions of the refrigerator allegedly used to dispose of the victim's body. Valenti testified that, in 1984, the [petitioner] had given him a refrigerator with locks on it, and that he had seen it last in 1987. Valenti described that refrigerator as similar to the refrigerator that had allegedly been used to dispose of the victim's body."

As we explain subsequently in this opinion, the state produced ample evidence to rebut this testimony. We note that the travel agent at the agency who accepted the returned airline ticket could not specifically identify the person who had returned the ticket.

Finally, we note that the petitioner impeached the credibility of Byers and Spetrino, both of whom admitted to having abused alcohol and drugs in the past. Spetrino also admitted to having used drugs on the night of the victim's alleged disappearance and both Spetrino and Byers testified that they had received favorable treatment from the state in exchange for their testimony. Thiel as well admitted to having used drugs around the time of the victim's murder, and there was evidence that the state never pursued charges against her subsequent to her arrest for cashing bad checks for the petitioner.

Following his unsuccessful direct appeal to this court; id., 539; the petitioner in 2006 filed the petition at issue in the present appeal. Specifically, the petitioner sought, pursuant to § 54-102kk, DNA testing of the biological material recovered from the Bridgeport harbor.[5]

---

[5] We note that the petitioner also sought DNA testing of the samples taken from his garage that contained the traces of blood, and has renewed that request in his brief to this court. There are two fundamental problems, however, that preclude relief as to this claim. First, under § 54-102kk, only evidence within the control of specified departments of the state can be subjected to testing, and a petitioner must demonstrate that the evidence is still in existence and capable of being tested. As this court's opinion in the petitioner's direct appeal explained in some detail, in January, 1990, as trial was getting underway, the state became aware that it could not locate the samples taken from the petitioner's garage and promptly informed the court and the petitioner. *State* v. *Marra*, supra, 222 Conn. 515. The trial court, *S. Freedman, J.*, thereafter denied the petitioner's motion to suppress testimony regarding the blood found on the samples, largely because the state had not acted maliciously or in bad faith in losing the evidence and because the petitioner had not attempted to view or test the samples in the period between getting notice of the test results in May, 1989, and notice of the loss of the evidence the following January. Id., 515–16. The trial court did, however, give the jury an instruction that it could draw an adverse inference against the state because of its failure to produce this evidence. Id., 516. This court rejected the petitioner's claim on direct appeal that the admission of the state's testimony deprived the petitioner of a fair trial. Id., 514, 517. In his brief to this court, the petitioner concedes that the "location [of these samples] is not presently known." The petitioner further contends that, although granting his request will not make the samples "magically reappear," we should draw an adverse inference against the state for purposes of this petition. The petitioner has cited no authority for this novel proposition, which appears to be in direct conflict with the requirements of § 54-102kk.

The second bar to relief is that, although the petitioner has asked for testing of these samples, the trial court's memorandum of decision contains no discussion of whether exculpatory test results for this evidence would have had any effect on the outcome in the criminal trial, and the petitioner never sought an articulation to address this issue. We surmise that the trial court may have declined to address the potential effect of this evidence because, as in his brief to this court, the petitioner made only a perfunctory claim regarding testing of the blood evidence, focusing instead almost exclusively on the material recovered from the Bridgeport harbor. Indeed, in his brief to this court, the petitioner simply claims that, if DNA tests revealed that the blood on the garage samples did not belong to the victim, "it would not have aided the state's case to put that blood evidence before the jury."

In an accompanying motion, the petitioner sought an order to compel one or both of the victim's brothers to submit to a cheek swab to collect mitochondrial DNA for comparison to the DNA retrieved from the aforementioned evidence to prove that the victim was not the source of that evidence. The trial court, *Comerford, J.*, denied the petition, concluding that the petitioner had not met the criteria for testing under either subsection (b) or (c) of § 54-102kk. The court found that the petitioner had satisfied subdivisions (2), (3) and (4) of both subsections by demonstrating that the evidence still was in existence and capable of being tested, that the evidence had not previously been subjected to DNA testing, and that the petition had been filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice. In determining whether the defendant had satisfied subdivision (1) of either subsection (b) or (c), which requires that "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing" in the case of § 54-102kk (b) (1), or that "[a] reasonable probability exists that the requested testing will produce DNA results which would have altered the verdict

Because the petitioner has failed to analyze how the absence of this evidence would have impacted the remaining, overwhelming evidence of guilt presented at trial, we decline to review this claim. See *State* v. *Bruno*, 293 Conn. 127, 143 n.13, 975 A.2d 1253 (2009) ("[b]ecause the law on this issue is unsettled, and the defendant's claim is inadequately briefed, we decline to review it"); *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003) ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" [internal quotation marks omitted]).

Nonetheless, in recognition of the contested nature of this evidence, as well as the trial court's instruction to the jury that it could draw a negative inference from the state's failure to produce this evidence; see *State* v. *Marra*, supra, 222 Conn. 516; we do not consider this evidence in determining whether the absence of DNA testing on the material recovered from the Bridgeport harbor undermines our confidence in the petitioner's trial for purposes of that claim under § 54-102kk.

or reduced the petitioner's sentence if the results had been available at the prior proceedings leading to the judgment of conviction" in the case of § 54-102kk (c) (1), the trial court applied the definition of " 'reasonable probability' " adopted by the United States Supreme Court for purposes of determining whether the state has committed a *Brady* violation[6] by withholding "material" evidence. Specifically, the trial court adopted the Supreme Court's definition of " 'reasonable probability' " as "a probability sufficient to undermine confidence in the outcome." *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d (1985).

The trial court recited in detail the evidence adduced at the petitioner's criminal trial, including, inter alia: evidence of motive; eyewitness accounts of the events before, during and after the victim's murder; witness testimony corroborating material aspects of the eyewitnesses' accounts; and the petitioner's own statements to the police that corroborated certain facts in those accounts. The trial court also found that "[t]here is no question that at the petitioner's trial, the state sought to have the jury draw an inference that the sneaker and the foot bones inside of it were those of the victim. To be sure, the sneaker was not unimportant at the petitioner's trial." Nonetheless, the trial court ultimately concluded: "This evidence against the petitioner [is] overwhelming and as such, the court finds that even if the sneaker with the bones inside of it were never found . . . a reasonable jury could still have found the petitioner's guilt established beyond a reasonable doubt. Hence, it is not reasonably probable that the petitioner would not have been prosecuted or convicted

---

[6] In *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Emphasis added.)

even if DNA testing were to establish that the bones did not belong to the victim. It is also not reasonably probable that the petitioner's verdict or sentence would have been altered." Accordingly, the court denied the petition for DNA testing and the accompanying motion.

On appeal to this court, the petitioner claims that the trial court improperly applied the reasonable probability test in determining whether to order DNA testing under subsections (b) and (c) of § 54-102kk. Specifically, he contends that, although the court cited the proper reasonable probability standard, it misapplied that standard by focusing on whether there would have been sufficient evidence to support the conviction even if the DNA tests had proved that the victim was not the source of the biological material recovered from the harbor. Instead, the petitioner asserts, the court should have examined whether favorable DNA tests would have undermined confidence in the verdict. He also claims that, because the state never produced the victim's body or the refrigerator, the absence of pretrial DNA testing demonstrating that the bones found in the recovered sneaker did not belong to the victim resulted in a verdict that was not worthy of confidence. We disagree.

We first review whether the trial court improperly denied the petition for DNA testing under § 54-102kk (b) (1) because it found that there was not a reasonable probability that the petitioner would not have been prosecuted or convicted had exculpatory evidence derived from DNA testing of the biological material been available at trial. Consistent with our decision in *State* v. *Dupigney*, supra, 295 Conn. 50, also decided today, the petitioner and the state agree that the trial court properly determined that the definition of reasonable probability established by the United States

Supreme Court in its *Brady-Strickland*[7] line of cases applies to § 54-102kk.[8] Moreover, the petitioner does not challenge the trial court's finding of facts. Accordingly, we limit our analysis to the trial court's application of the reasonable probability standard to the facts of this case.

We next set forth our standard of review and relevant legal framework for application of that definition. As set forth in *State* v. *Dupigney*, supra, 295 Conn 68, "the determination of whether a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing pursuant to § 54-102kk (b) (1) is a question of law subject to plenary review, while any underlying historical facts found by the trial court are subject to review for clear error." (Internal quotation marks omitted.)[9] In *Dupigney*, we also deter-

[7] *Strickland* v. *Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (Setting forth the standard for ineffective assistance of counsel claims under which a defendant must prove prejudice by showing that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

[8] Both parties agree that the definition of reasonable probability as a "probability sufficient to undermine confidence in the outcome" as enunciated in *Strickland* v. *Washington*, 496 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), applies to § 54-102kk. Nonetheless, the amicus curaie, the Connecticut Criminal Defense Lawyers Association, urges this court to adopt the "significant possibility" formulation of reasonable probability set out in Justice Souter's dissent in *Strickler* v. *Greene*, 527 U.S. 263, 297–300, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). In light of our decision today in *State* v. *Dupigney*, supra, 295 Conn. 64, expressly defining reasonable probability as a probability sufficient to undermine confidence in the outcome, the amicus' claim is unavailing.

[9] Additionally, as in *Dupigney*, because the judge who denied the petition had not presided over the criminal trial, "we need not decide whether the additional deference enunciated in [*State* v. *Ortiz*, 280 Conn. 686, 720–21, 911 A.2d 1055 (2006)] applies to appellate review of petitions under § 54-102kk because the trial judge who reviewed the petition in the present case did not preside over the criminal trial or sentencing." *State* v. *Dupigney*, supra, 295 Conn. 68 n.18.

mined that the "reasonable probability" analysis under § 54-102kk (b) (1) mirrors the reasonable probability analyses set forth in this court's *Brady* and *Strickland* lines of cases. Id., 60–64. Accordingly, "reasonable probability" within the context of § 54-102kk (b) (1) means "a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) Id., 64. Under this standard, "a showing of reasonable probability does not require demonstration by a preponderance that disclosure of the [unavailable] evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. . . . The United States Supreme Court also emphasized that the [relevant inquiry] . . . is not a sufficiency of the evidence test. . . . A defendant need not demonstrate that after discounting the inculpatory evidence in light of the [unavailable] evidence, there would not have been enough left to convict. . . . Accordingly, the focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether [the unavailability] of the [exculpatory] evidence was so unfair as to undermine our confidence in the jury's verdict." (Citation omitted; internal quotation marks omitted.) Id., 62–63.

In analyzing the effect of DNA evidence, § 54-102kk (b) (1) directs us to consider the effect of potential "exculpatory results" obtained through DNA testing. Accordingly, in the present case, we assume that DNA testing would reveal that the foot bones and the sneaker discovered in Bridgeport harbor did not belong to the victim. The petitioner contends that, if these test results had been available prior to trial, the bones and sneaker

evidence would not have been introduced at trial, and the jury therefore would not have heard testimony linking that evidence to the sneaker worn by the victim on the night he disappeared. As a result, the petitioner contends that the jury would have been presented with no evidence of the remains of the victim. The petitioner also contends that these results would have aided in undermining the testimony of John F. Solomon, a police inspector with the state division of criminal justice assigned to the state's attorney's office for the judicial district of Fairfield, who had bolstered Spetrino's testimony by asserting his belief that the victim had been killed on February 6, 1984, and that the sneaker belonged to the victim. The net result of excluding this evidence from trial, according to the petitioner, raises a reasonable probability that he would not have been prosecuted or convicted had the DNA evidence been available before trial.

Although we agree with the petitioner about the immediate consequences that the DNA evidence would have had on his trial, we disagree that their cumulative impact raises a probability, sufficient to undermine our confidence in the original outcome, that he would not have been prosecuted or convicted. In so concluding, we are cognizant that the trial court found that "the state [had] sought to have the jury draw an inference that the sneaker and the foot bones inside of it were those of the victim." Indeed, in determining in the petitioner's direct appeal from his conviction that the trial court properly admitted the bones at the criminal trial, this court noted that "[t]he sneaker, sock and bones were obviously offered to attempt to establish that the victim was in fact dead"; *State* v. *Marra*, supra, 222 Conn. 521–22; and that the evidence "tended to support the state's contention that the victim had indeed died as a result of the [petitioner's] actions." Id., 522.

In order to determine whether the potential DNA evidence would create a reasonable probability that the petitioner would not have been prosecuted or convicted, we must consider, however, the evidence within the context of the entire trial. See *State* v. *Daugaard*, 231 Conn. 195, 207, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995); *State* v. *Shannon*, 212 Conn. 387, 399–400, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989). Because the evidence, derived from eyewitnesses and corroborated through both testimony and physical evidence, amply supported the conclusion that the petitioner had, in fact, killed the victim, we agree with the trial court that there was not a reasonable probability that the petitioner would not have been prosecuted or convicted had exculpatory evidence derived from DNA testing of the biological material been available at trial.[10]

---

[10] The trial court engaged in a substantially similar analysis, which the petitioner challenges on the ground that it is an improper sufficiency of the evidence test. Although the determination of reasonable probability is not a sufficiency of the evidence test; *State* v. *Dupigney*, supra, 295 Conn. 63; the reasonable probability analysis does require that we take into account the totality of the evidence adduced at the original trial in order to determine whether the absence of exculpatory DNA evidence undermines our confidence in the verdict predicated on that evidence. Id.; see also *United States* v. *Orena*, 145 F.3d 551, 558 (2d Cir. 1998) ("[a]lthough [*Kyles* v. *Whitley*, 514 U.S. 419, 434–35, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)] made clear that the test of materiality is whether the withheld evidence reasonably undermines confidence in the verdict—not whether sufficient independent evidence exists to support a conviction . . . the existence of substantial independent evidence of guilt is unavoidably relevant to whether withheld impeachment evidence can reasonably call the jury's verdict into question" [citation omitted]); *State* v. *Shannon*, supra, 212 Conn. 399–400 ("In analyzing a *Brady* claim, the courts must avoid concentrating on the suppressed evidence in isolation. Rather, we must place it in the context of the entire record. . . . Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." [Internal quotation marks omitted.]). This is especially true in the present case, because, unlike a more "traditional" DNA exoneration case, such as where DNA testing on semen obtained from a rape victim reveals that the defendant had not committed the sexual

At trial, Byers and Spetrino testified regarding the petitioner's plan to bring the victim to the garage. They also testified about the petitioner's actions in causing the victim's death by first directing Spetrino to hit the victim with the bat, then repeatedly striking the victim in the head with the bat himself and, thereafter, directing Byers and Spetrino to help him put the victim's body into the refrigerator, which the petitioner thereafter padlocked. Spetrino, who had accompanied the petitioner to Bridgeport harbor, testified that he had helped the petitioner cut holes in the refrigerator with an ax, push the refrigerator into the harbor and dispose of the bat, ax and his own bloody clothing. Spetrino identified the ax recovered near the Grand Street Bridge as the one they had used to cut holes in the refrigerator, and the police also recovered a bat from that same site. The testimony from these two eyewitnesses, and Spetrino's earlier voluntary statements to the police, not only directly implicated the petitioner in the murder, but also implicated themselves in the crime.

The account offered by Spetrino and Byers was corroborated by two other witnesses: Brenda Sholomicky, who was married to the petitioner in 1984, but subsequently divorced him; and Thiel. Sholomicky testified that, on a winter night in 1984, she had seen Spetrino and Byers get out of a car parked in the petitioner's driveway, that she had heard the petitioner in the garage just before that time, that she had heard voices on the side of the house, and that, when the petitioner and Spetrino later came into the house, Spetrino had blood all over his clothes, face, hands and sneakers. When she asked the petitioner what had happened, he replied, "[you] 'don't want to know.' " The petitioner told her to get Spetrino a change of clothes and a plastic garbage

---

assault, the effect of favorable DNA evidence would be limited to preventing the state from introducing the sneaker and bone evidence and, as such, would not *directly* exculpate the petitioner.

bag. Spetrino changed into a gray jogging suit that Sho-
lomicky brought him and placed his clothes and sneak-
ers into the garbage bag. Finally, Sholomicky testified
that there had been a refrigerator in the petitioner's
garage on February 6, 1984, and that, a few weeks later,
she had noticed that it no longer was there.

Thiel corroborated the account offered by Spetrino
and Byers through testimony that she had driven to the
petitioner's house with the victim, Spetrino and Byers
and that Spetrino had been wearing a gray jogging suit
when he returned to Byers' house later that night, which
he had not been wearing earlier in the evening. Thiel
also testified that, several days before the victim's disap-
pearance, the petitioner had warned him not to talk to
the police because the petitioner was nervous that the
victim was going to implicate him in the alleged criminal
activity being investigated by the police. Thiel also testi-
fied that, after the night of February 6, 1984, the peti-
tioner had engaged in various ruses to convince her
that the victim still was alive, all of which were false.[11]

The petitioner's own conduct and statements further
implicated him in the victim's murder. The state intro-
duced statements made by the petitioner in interviews
with the police and, although he initially stated that, to
his knowledge, the victim was alive and well, after the
police informed the petitioner of their intent to arrest
him for the murder, the petitioner stated that he could

---

[11] The trial court noted: "Shortly after the victim disappeared, the petitioner
gave [Thiel] a letter that he claimed was from the victim in Italy. The letter
was supposedly signed by the victim, but there was no envelope. On another
occasion, the petitioner told [Thiel] that he was calling the victim in Italy.
He gave Thiel the [tele]phone but Thiel only spoke to an operator and never
got in touch with the victim. A short time after that, on April 25, 1984, the
petitioner told Thiel that she could go see the victim in New York City. The
petitioner bought Thiel a train ticket to New York and told her that the
victim was staying in room 269 at the Milford Plaza Hotel. Thiel went to
the hotel, but when she got there, she was told that there was no room 269
at the hotel, and there was no one by the [victim's] name . . . staying there."

tell the police where to find the victim's body without looking in the water. The police did not investigate the petitioner's claim because they did not believe it to be true. The petitioner's tape-recorded interviews with the police also corroborated the fact that he had bought a plane ticket to Italy for the victim, that he was aware that the victim did not leave on that flight, that the petitioner had rented a van on the afternoon of February 6, 1984, and that he had returned it the following day.

Finally, the state elicited conclusive evidence that no one, including the victim's girlfriend or family members, had heard from the fifteen year old victim after February 6, 1984, and that there was no record of the victim having traveled to Italy or anywhere else where his family had relatives. To rebut the petitioner's theory that the victim had fled the country, the state offered testimony from the victim's brother, Michael Palmieri, who testified that he had called the family's relatives in Argentina, Italy and California and that none of them had heard from the victim after February 6, 1984. Michael Palmieri also went to these destinations to look for the victim, but did not locate him.

Considering the strength of this evidence, our confidence in the fairness and reliability of the petitioner's trial is not undermined by the absence of DNA testing of the biological material recovered from the harbor. As the trial court in the criminal trial instructed the jury, the state does not need to produce a murder victim's body to sustain a murder conviction, and there was no credible evidence in the present case that the victim was alive to disprove the strong evidence to the contrary. Accordingly, we conclude that the trial court properly denied the petitioner's request for DNA testing under § 54-102kk (b) because it properly determined that the petitioner had failed to demonstrate that there was a reasonable probability that he would not have

been prosecuted or convicted had the DNA evidence been available before the trial.

In concluding, we briefly address the petitioner's claim that the trial court also improperly denied his motion for DNA testing under § 54-102kk (c). In his petition, the petitioner sought relief under § 54-102kk without specifying whether he was seeking relief under § 54-102kk (b) or (c), or both of those subsections. Although the trial court initially cited separately to both § 54-102kk (b) and (c), its analysis conflated the subsections. In his brief to this court, the petitioner does not engage in any independent analysis of the divergent language in these subsections, instead making only a conclusory contention that, "if . . . exculpatory results had been available prior to trial . . . there would have been a reasonable probability that he would not have been prosecuted or convicted . . . or, alternatively, that the jury would have rendered a verdict more favorable to him, or that he might have received a more favorable sentence." Therefore, in light of our determination resolving the petitioner's claim under § 54-102kk (b), we conclude that the trial court properly denied the petition under § 54-102kk (c).

The decision is affirmed.

In this opinion the other justices concurred.