STATE OF CONNECTICUT *v.* ROGER P. COTE
(AC 31865)

Beach, Robinson and Alvord, Js.

Argued March 18—officially released July 5, 2011

*Heather M. Wood*, assistant public defender, with whom, on the brief, was *Kent Drager*, senior assistant public defender, for the appellant (petitioner).

*Kathryn Ward Bare*, assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Bonnie R. Bentley*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. The petitioner, Roger P. Cote, appeals following the denial of his petition for DNA (deoxyribonucleic acid) testing of certain evidence that had been introduced by the state in his criminal trial, pursuant to General Statutes § 54-102kk.[1] On appeal, the petitioner

---

[1] General Statutes § 54-102kk provides: "(a) Notwithstanding any other provision of law governing postconviction relief, any person who was convicted of a crime and sentenced to incarceration may, at any time during the term of such incarceration, file a petition with the sentencing court requesting the DNA testing of any evidence that is in the possession or control of the Division of Criminal Justice, any law enforcement agency, any laboratory or the Superior Court. The petitioner shall state under penalties of perjury that the requested testing is related to the investigation or prosecution that resulted in the petitioner's conviction and that the evidence sought to be tested contains biological evidence.

"(b) After notice to the prosecutorial official and a hearing, the court shall order DNA testing if it finds that:

"(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing;

claims that the trial court improperly concluded that he failed to establish that a reasonable probability existed that he would not have been convicted if exculpatory results obtained through DNA testing had been available at his criminal trial. We affirm the decision of the trial court.

The record reveals the following facts, which are largely undisputed, as well as the pertinent procedural history. The petitioner and the victim met and began to have a romantic relationship in November, 2001. By the end of that month, the petitioner had moved into the victim's apartment where the victim resided with

"(2) The evidence is still in existence and is capable of being subjected to DNA testing;

"(3) The evidence, or a specific portion of the evidence identified by the petitioner, was never previously subjected to DNA testing, or the testing requested by the petitioner may resolve an issue that was never previously resolved by previous testing; and

"(4) The petition before the Superior Court was filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice.

"(c) After notice to the prosecutorial official and a hearing, the court may order DNA testing if it finds that:

"(1) A reasonable probability exists that the requested testing will produce DNA results which would have altered the verdict or reduced the petitioner's sentence if the results had been available at the prior proceedings leading to the judgment of conviction;

"(2) The evidence is still in existence and is capable of being subjected to DNA testing;

"(3) The evidence, or a specific portion of the evidence identified by the petitioner, was never previously subjected to DNA testing, or the testing requested by the petitioner may resolve an issue that was never previously resolved by previous testing; and

"(4) The petition before the Superior Court was filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice.

"(d) The costs of DNA testing ordered pursuant to this section shall be borne by the state or the petitioner, as the court may order in the interests of justice, except that DNA testing shall not be denied because of the inability of the petitioner to pay the costs of such testing.

"(e) In a proceeding under this section, the petitioner shall have the right to be represented by counsel and, if the petitioner is indigent, the court shall appoint counsel for the petitioner in accordance with section 51-296."

her four children. The relationship quickly deteriorated. Beginning as early as December, 2001, the petitioner and the victim had verbal disputes that escalated into physical abuse. Although the relationship ended in October, 2002, the petitioner continued to reside in the apartment and slept on the couch.

At around 5 a.m. on the morning of December 23, 2002, the victim was asleep in her bedroom when she heard the petitioner enter the bedroom and lock the door. When the petitioner entered the room, he accused the victim of infidelity and asked her to have sex with him. The victim told the petitioner that she had to get up to go to work, and then she attempted to get out of her bed. The petitioner, however, pushed her down and pinned her to the bed with his body weight so that she could not get up. While on top of her, the petitioner pulled out a folding knife that the victim had never seen before and held it to her throat. The petitioner began to rub the blade up and down the victim's neck and behind her ear, scraping her skin and causing cuts on her neck. At some point during the incident, the victim attempted to push the knife away and cut her finger. The victim did not scream or call out for any help during the incident because she feared for her life and the safety of her children who were sleeping nearby.

The petitioner eventually grew tired and released the pressure on the knife against the victim's neck. Shortly thereafter, the petitioner and the victim talked and cried together until the petitioner fell asleep. While the petitioner was asleep, the victim picked up the knife and left the room. The victim then drove herself and her children to her parents' house. After the victim's father arrived home and she had told him what had happened, she drove to the resident state police trooper's office in Killingly where Trooper Leonard Blanchette took a written statement, photographed the fresh injuries to her neck and finger, and seized the knife that she had

brought with her. At around noon on that same day, the police located the petitioner at the victim's home and arrested him.

Subsequently, the petitioner was charged with assault in the second degree in violation of General Statutes § 53a-60 (a) (2),[2] threatening in the second degree in violation of General Statutes § 53a-62 (a) (1)[3] and unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a).[4] On July 25, 2003, additional charges stemming from the December, 2002 incident were filed against the petitioner, namely, attempt to commit sexual assault in the first degree and sexual assault in the third degree.

On September 22, 2004, following the petitioner's criminal trial, a jury found him guilty of assault in the second degree in violation of § 53a-60 (a) (2), threatening in the second degree in violation of § 53a-62 (a) (1) and unlawful restraint in the first degree in violation of § 53a-95 (a).[5] Thereafter, the trial court, *Dannehy, J.*, imposed a total effective sentence of twelve years incarceration, followed by six years of special parole, to run consecutively to a sentence that the petitioner

---

[2] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ."

[3] General Statutes § 53a-62 (a) provides in relevant part: "A person is guilty of threatening in the second degree when: (1) By physical threat, such person intentionally places or attempts to place another person in fear of imminent serious physical injury . . . ."

[4] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

[5] The petitioner also was convicted of violation of a protective order and was acquitted of both sexual assault charges. In addition, the petitioner entered a written plea of nolo contendere to a part B information charging him as a persistent serious felony offender.

was then serving. The petitioner directly appealed to this court, which affirmed his conviction. *State* v. *Cote*, 101 Conn. App. 527, 922 A.2d 322, cert. denied, 284 Conn. 901, 931 A.2d 266 (2007).

On May 21, 2009, the petitioner filed a postconviction petition for DNA testing pursuant to § 54-102kk, to have the knife tested to determine whether any of the victim's DNA was on it, in order to demonstrate his innocence with regard to his conviction of assault in the second degree. In support of his petition, the petitioner alleged that a reasonable probability existed that the requested testing of the knife would produce DNA results which would have altered the verdict, that the knife was still in existence and was capable of being subject to DNA testing, that the knife never was subjected to DNA testing and that his petition was filed in order to demonstrate his innocence. On September 8, 2009, the trial court, *Robaina, J.*, held a hearing on the petition and, on December 4, 2009, denied the motion. In its memorandum of decision, the court concluded: "[T]here is no evidence upon which [this court] can find that testing of the knife for DNA evidence would have altered the verdict . . . . There is no reasonable probability that the petitioner would not have been prosecuted or convicted had the results of the DNA testing been somehow 'exculpatory.' " In its analysis, the court emphasized the mountain of inculpatory evidence adduced at the criminal trial, noting that such evidence lessened the probability that the DNA evidence would have altered the verdict. Subsequently, the petitioner appealed.

On appeal, the petitioner claims that the court improperly concluded that he failed to establish that a reasonable probability existed that he would not have been convicted if exculpatory results obtained through DNA testing of the knife had been available at his criminal trial. Specifically, the petitioner claims that, if the results from a DNA test of the knife confirm the absence

of the victim's DNA, then there is a reasonable probability that he would not have been convicted of assault in the second degree.[6] We disagree.

We begin by setting forth our standard of review and the relevant legal framework. "[T]he determination of whether a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing pursuant to § 54-102kk (b) (1) is a question of law subject to plenary review, while any underlying historical facts found by the trial court are subject to review for clear error. . . .

"[R]easonable probability within the context of § 54-102kk (b) (1) means a probability sufficient to undermine confidence in the outcome. . . . Under this standard, a showing of reasonable probability does not require demonstration by a preponderance that disclosure of the [unavailable] evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. . . . The United States Supreme Court also emphasized that the [relevant inquiry] . . . is not a sufficiency of the evidence test. . . . A defendant

---

[6] On the basis of our review of the record, it appears that the trial court conflated § 54-102kk (b) (1) and (c) (1) in its analysis and concluded that a reasonable probability did not exist under *either* section. The petitioner's only claim on appeal, however, is that the court made an improper reasonable probability determination under § 54-102kk (b) (1). The petitioner does not claim that the court improperly applied § 54-102kk (c) (1), nor does he analyze independently in his brief whether the court properly applied that section. In fact, in his brief, the petitioner concedes that the present case can be decided solely under § 54-102kk (b) (1). Nevertheless, in light of our determination resolving the petitioner's claim under § 54-102kk (b), we conclude that the trial court properly denied the petition under § 54-102kk (c).

need not demonstrate that after discounting the inculpatory evidence in light of the [unavailable] evidence, there would not have been enough left to convict. . . . Accordingly, the focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether [the unavailability] of the [exculpatory] evidence was so unfair as to undermine our confidence in the jury's verdict. . . .

"In analyzing the effect of DNA evidence, § 54-102kk (b) (1) directs us to consider the effect of potential exculpatory results obtained through DNA testing. At this point, it is evident that the petitioner will not know with certainty what DNA testing will show. Thus, § 54-102kk (b) (1) requires the court to consider the effect of the most favorable result possible from DNA testing of the evidence . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Butler*, 129 Conn. App. 833, 839–40, 21 A.3d 583 (2011). In the present case, therefore, we assume that DNA testing would reveal the absence of the victim's DNA on the knife. The petitioner contends that, had this DNA evidence been available at the original trial, it would have been less likely that the jury would have found that the state proved beyond a reasonable doubt the "dangerous instrument" element of assault in the second degree because the absence of the victim's DNA on the knife tends to show that the knife did not penetrate the victim's neck. Accordingly, the petitioner contends that this DNA evidence creates a reasonable probability that he would not have been convicted of assault in the second degree.

As an initial matter, we note that standing alone, this DNA evidence does little to exculpate the petitioner.

From this DNA evidence, a jury might infer at best either that: (1) the petitioner used the knife to injure the victim, causing the victim's DNA to be deposited on the knife, but for reasons unknown, the DNA no longer is detectable through DNA testing, or (2) the petitioner did not use that particular knife to injure the victim. Accordingly, this DNA evidence does not establish that the petitioner did not use a "dangerous instrument" to injure the victim.

Furthermore, even assuming that the DNA testing determines that the victim's DNA is not present on the knife in evidence, we must consider this evidence within the context of the entire trial. Id., 841; see also *State* v. *Marra*, 295 Conn. 74, 90, 988 A.2d 865 (2010) (reasonable probability analysis requires that court take into account totality of evidence adduced at original trial in order to determine whether absence of exculpatory DNA evidence undermines confidence in verdict). The record reveals that there was overwhelming evidence adduced at trial demonstrating that the petitioner had used the knife to cut the victim's neck. The victim testified that she observed the knife as the petitioner held it and described in detail the physical characteristics of the knife. The knife was admitted as a full exhibit without objection by the petitioner. The victim also testified that the petitioner pressed the knife on her neck and rubbed it up and down and that she could feel the blade of the knife rolling underneath her skin. The victim's son and father both testified, under the spontaneous utterance hearsay exception; see Conn. Code Evid. § 8-3 (2); that the victim had told them that the petitioner had held a knife to her neck in a threatening manner. Moreover, the lacerations on the victim's neck were observed directly by the victim, her son, her father and Blanchette. Additionally, Blanchette testified

that, on the day of the incident, he observed lacerations on the victim's neck that appeared to have been made by a sharp object and that he photographed the victim's injuries. Those photographs were admitted into evidence. Although the petitioner denied having used the knife to cut the petitioner's neck, he testified that he recognized the knife, that it was "razor blade sharp" and that it always was attached to the belt loop of his pants, which were in the bedroom when the incident occurred. Because the evidence, derived from eyewitnesses and corroborated through both testimony and physical evidence, amply supported the conclusion that the petitioner had, in fact, used the knife to injure the victim, we agree with the trial court that there was not a reasonable probability that the petitioner would not have been convicted had exculpatory evidence derived from DNA testing of the biological material been available at trial.

The decision is affirmed.

In this opinion the other judges concurred.