STATE OF CONNECTICUT *v.* JAMES L. BUTLER
(AC 31965)

Lavine, Beach and Robinson, Js.

Argued March 21—officially released July 5, 2011

*Thomas P. Mullaney III*, special public defender, for the appellant (petitioner).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *John J. Davenport*, supervisory assistant state's attorney (state).

*Opinion*

ROBINSON, J. The petitioner, James L. Butler, appeals following the denial of his petition for DNA (deoxyribonucleic acid) testing of certain evidence that had been introduced by the state in his criminal trial,

pursuant to General Statutes § 54-102kk.[1] On appeal, the petitioner claims that the trial court improperly

[1] General Statutes § 54-102kk provides: "(a) Notwithstanding any other provision of law governing postconviction relief, any person who was convicted of a crime and sentenced to incarceration may, at any time during the term of such incarceration, file a petition with the sentencing court requesting the DNA testing of any evidence that is in the possession or control of the Division of Criminal Justice, any law enforcement agency, any laboratory or the Superior Court. The petitioner shall state under penalties of perjury that the requested testing is related to the investigation or prosecution that resulted in the petitioner's conviction and that the evidence sought to be tested contains biological evidence.

"(b) After notice to the prosecutorial official and a hearing, the court shall order DNA testing if it finds that:

"(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing;

"(2) The evidence is still in existence and is capable of being subjected to DNA testing;

"(3) The evidence, or a specific portion of the evidence identified by the petitioner, was never previously subjected to DNA testing, or the testing requested by the petitioner may resolve an issue that was never previously resolved by previous testing; and

"(4) The petition before the Superior Court was filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice.

"(c) After notice to the prosecutorial official and a hearing, the court may order DNA testing if it finds that:

"(1) A reasonable probability exists that the requested testing will produce DNA results which would have altered the verdict or reduced the petitioner's sentence if the results had been available at the prior proceedings leading to the judgment of conviction;

"(2) The evidence is still in existence and is capable of being subjected to DNA testing;

"(3) The evidence, or a specific portion of the evidence identified by the petitioner, was never previously subjected to DNA testing, or the testing requested by the petitioner may resolve an issue that was never previously resolved by previous testing; and

"(4) The petition before the Superior Court was filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice.

"(d) The costs of DNA testing ordered pursuant to this section shall be borne by the state or the petitioner, as the court may order in the interests of justice, except that DNA testing shall not be denied because of the inability of the petitioner to pay the costs of such testing.

"(e) In a proceeding under this section, the petitioner shall have the right to be represented by counsel and, if the petitioner is indigent, the court shall appoint counsel for the petitioner in accordance with section 51-296."

concluded that he failed to establish that a reasonable probability existed that he would not have been prosecuted or convicted if exculpatory results obtained through DNA testing had been available at his criminal trial. We affirm the decision of the trial court.

The record, including our opinion in the petitioner's appeal from his underlying judgment of conviction, reveals the following facts that the jury reasonably could have found, as well as the pertinent procedural history. "On October 16, 2000, the [petitioner] and his accomplice, Charles Spells, entered the Mobil gasoline station on Watertown Avenue in Waterbury. Both men wore masks to conceal their identity, and the [petitioner] also carried a shotgun. The men took $160 in cash, lottery tickets and the store clerk's watch. The [petitioner] aimed the shotgun at a customer and dragged him into an aisle before he took the man's wallet. The [petitioner] aimed the shotgun at another customer and forced her to the floor and demanded her money.

"On October 20, 2000, the [petitioner] and Spells entered the Cumberland Farms convenience store on Watertown Avenue in Waterbury. Both men were dressed in black, wore masks and the [petitioner] carried a shotgun. The men took $400 from the cash register. Spells struck one customer with a blunt metal object and took the man's wallet. Another customer surrendered her car keys to the [petitioner] and informed him that there was more than $300 in the vehicle. The two men took the keys and left in the vehicle.

"Neither the customers nor the clerks could identify the perpetrators of the crime because the men were wearing masks. They, however, provided general descriptions of the men: Both were African-American, one was approximately six feet tall and the other was approximately five feet, seven inches tall. Those

descriptions fit the [petitioner] and Spells, respectively. The police found the customer's vehicle abandoned in a nearby parking lot and her purse on a nearby street. More than $300 in cash and a laptop computer were missing from the vehicle. The police also found a black mask that contained several strands of head hair in the vehicle.

"On October 30, 2000, the [petitioner] turned himself in to the Waterbury police department on an outstanding warrant. The [petitioner] was interrogated, confessed to the crimes and implicated Spells as his accomplice.[2] In giving his statement to the police, the [petitioner] provided details of the two crimes of which only a participant would have been aware. He knew where the customer's vehicle had been abandoned and told the police where the keys could be located. Utilizing the [petitioner's] confession, the police found the keys. The [petitioner] also stated that the car used in the Mobil gasoline station robbery belonged to Chiquita Diggs, the girlfriend of Spells. The [petitioner] further confessed that after the robbery, Spells gave him $50, took the black mask and they went their separate ways. The police subsequently interviewed Diggs. Diggs informed the police of the location of the shotgun, which was recovered in Lakewood Lake. The [petitioner] recanted his confession at trial. . . .

"Diggs testified outside the presence of the jurors that she was staying at the home of Spells at the time of the October 16, 2000 robbery. Spells was armed with a shotgun when he entered the home. She testified that James Gardner and Levelle Kelly accompanied him. Spells was in possession of a laptop computer, a watch and a checkbook. Diggs also stated that after Spells

[2] The record also reveals that Spells earlier had confessed to the crime and implicated the petitioner as his accomplice. *State* v. *Butler*, 81 Conn. App. 100, 103 n.1, 837 A.2d 896, cert. denied, 268 Conn. 902, 845 A.2d 405 (2004).

was arrested, Gardner threatened her with a shotgun to keep [her] quiet and drove her to Lakewood Lake where he disposed of the shotgun. The court did not allow the [petitioner] to present Diggs' testimony regarding the issue of third party guilt because her testimony did not establish a direct link to the robberies." *State* v. *Butler*, 81 Conn. App. 100, 102–104, 837 A.2d 896, cert. denied, 268 Conn. 902, 845 A.2d 405 (2004).

On March 20, 2002, after a jury trial, the petitioner was convicted of five counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4) and two counts of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (4). On June 4, 2002, the court sentenced the petitioner to a total effective term of twenty years incarceration followed by ten years of special parole. The petitioner directly appealed to this court, and we affirmed his conviction. See id., 101–102.

On September 18, 2009, the petitioner filed a postconviction petition for DNA testing pursuant to § 54-102kk to have strands of hair recovered from the mask tested to determine whether the hair belonged either to Gardner or to Kelly, in order to demonstrate his innocence. In support of his petition, the petitioner alleged that a mask containing strands of hair was recovered from the crime scene, that the strands of hair were tested and found to be dissimilar to the petitioner's hair, that Gardner's and Kelly's DNA is located in the Connecticut DNA database (DNA database), that DNA testing of the strands of hair and a match of the DNA results against the information in the DNA database could show that the hair in the mask belonged either to Gardner or to Kelly, and that evidence of third party guilt proffered by Diggs, but not admitted into evidence, revealed that Gardner had demonstrated inculpatory knowledge of the robberies. On November 4, 2009, the court denied

the petition on the basis that the petitioner failed to satisfy the criteria set forth in § 54-102kk (b) (1), which required that the petitioner establish that a reasonable probability existed that he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing of the hairs in the mask. Subsequently, the petitioner appealed.

On appeal, the petitioner claims that the court improperly concluded that he failed to establish that a reasonable probability existed that he would not have been prosecuted or convicted if exculpatory results obtained through DNA testing of the hairs in the mask had been available at his criminal trial. Specifically, the petitioner claims that, if the results from a DNA test of the hairs in the mask confirm the presence of either Gardner's or Kelly's DNA, there exists a reasonable probability that he would not have been convicted. We disagree.

We begin by setting forth our standard of review and the relevant legal framework. "[T]he determination of whether a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing pursuant to § 54-102kk (b) (1) is a question of law subject to plenary review, while any underlying historical facts found by the trial court are subject to review for clear error." (Internal quotation marks omitted.) *State* v. *Dupigney*, 295 Conn. 50, 68, 988 A.2d 851 (2010).

"[R]easonable probability within the context of § 54-102kk (b) (1) means a probability sufficient to undermine confidence in the outcome. . . . Under this standard, a showing of reasonable probability does not require demonstration by a preponderance that disclosure of the [unavailable] evidence would have resulted

ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. . . . The United States Supreme Court also emphasized that the [relevant inquiry] . . . is not a sufficiency of the evidence test. . . . A defendant need not demonstrate that after discounting the inculpatory evidence in light of the [unavailable] evidence, there would not have been enough left to convict. . . . Accordingly, the focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether [the unavailability] of the [exculpatory] evidence was so unfair as to undermine our confidence in the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Marra*, 295 Conn. 74, 88, 988 A.2d 865 (2010).

In analyzing the effect of DNA evidence, § 54-102kk (b) (1) directs us to consider the effect of potential "exculpatory results" obtained through DNA testing. At this point, it is evident that the petitioner will not know with certainty what DNA testing will show. Thus, § 54-102kk (b) (1) requires the court to consider "the effect of the most favorable result possible from DNA testing of the evidence . . . ." *State* v. *Dupigney*, supra, 295 Conn. 73. Accordingly, in the present case, we assume that DNA testing of the hairs in the mask would reveal the presence of Gardner's or Kelly's DNA. As an initial matter, we note that this DNA evidence at best is tenuous. The presence of Gardner's or Kelly's DNA in the mask merely would establish that either had worn the mask at some unknown point in time, not that either was involved in the robberies as Spells' accomplice. Moreover, such evidence would not establish that the

petitioner either had never worn the mask or had not committed the robberies.

Furthermore, even assuming that the DNA evidence tends to demonstrate that either Gardner or Kelly, and not the petitioner, was Spells' accomplice in the robberies, we must consider this evidence within the context of the entire trial.[3] See *State* v. *Marra*, supra, 295 Conn. 90 (reasonable probability analysis requires that court take into account totality of evidence adduced at original trial in order to determine whether absence of exculpatory DNA evidence undermines confidence in verdict). Here, the record reveals that the petitioner confessed to committing the robberies and that his confession was admitted into evidence. As we noted in our opinion addressing the petitioner's direct appeal, the confession contained details of the robberies of which only a participant would have been aware. *State* v. *Butler*, supra, 81 Conn. App. 103. Although the petitioner recanted his confession at trial, and proffered the testimony of Diggs in order to link Gardner to the robberies; id., 103–104; such evidence is of no moment where, as here, his depiction of the robberies was corroborated by the testimony of numerous eyewitnesses and video surveillance footage from the Cumberland Farms robbery. In addition to the evidence that corroborated the petitioner's confession, Spells implicated the petitioner as an accomplice to the robberies, and the petitioner also fit the general description of one of the robbers, as provided by eyewitness testimony. Finally, the record reveals that the jury was aware that the hairs in the mask were dissimilar to the petitioner's hair. Because

---

[3] We note that neither party made the full criminal trial transcript part of the record in this appeal. Our review, therefore, is based on the limited portions of the trial transcript that the parties cite in their briefs. We note that, in a closer case, the presence or absence of a more complete record could have significant bearing on the determination of reasonable probability.

the evidence, derived from eyewitnesses and corroborated through both testimony and physical evidence, amply supported the conclusion that the petitioner, in fact, had committed the robberies in question, we agree with the trial court that there was not a reasonable probability that the petitioner would not have been prosecuted or convicted had exculpatory evidence derived from DNA testing of the biological material been available at trial.

The decision is affirmed.

In this opinion the other judges concurred.