******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* BARRY J. SMITH (AC 47278)

Moll, Westbrook and Eveleigh, Js.

*Syllabus*

The defendant, who previously had been convicted, after a jury trial, of murder and felony murder, appealed from the trial court's judgment denying his postconviction petition, pursuant to statute (§ 54-102kk (b)), seeking DNA testing of fingernail scrapings that had been collected from the victim's body during the investigation of the murder. The defendant claimed that the court improperly failed to conclude that exculpatory results of that DNA testing would have created a reasonable probability that he would not have been prosecuted or convicted had it been available at his criminal trial. *Held*:

The defendant failed to present sufficient evidence to establish that DNA testing of the fingernail scrapings would have resulted in a reasonable probability that he would not have been prosecuted or convicted, as the absence of his DNA or the presence of a third party's DNA would not necessarily mean that the defendant was not present at the murder scene or did not participate in the commission of the crime, and it would not necessarily discredit the testimony of a witness who saw him participate in the commission of the murder.

Argued October 8, 2025—officially released May 5, 2026

*Procedural History*

Petition for postconviction DNA testing of certain biological evidence collected in connection with the defendant's previous criminal trial, brought to the Superior Court in the judicial district of Waterbury, where the court, *Klatt, J.*, denied the petition, and the defendant appealed to this court. *Affirmed*.

*Jennifer B. Smith*, assistant public defender, for the appellant (defendant).

*Nicholas L. Scarlett*, deputy assistant state's attorney, with whom, on the brief, was *Maureen Platt*, state's attorney, for the appellee (state).

*Opinion*

WESTBROOK, J. The defendant, Barry J. Smith (petitioner), appeals from the denial of his postconviction petition for DNA testing of biological evidence under General

Statutes § 54-102kk.[1] The petitioner claims that the trial court improperly concluded that a reasonable probability did not exist that materially exculpatory evidence would have resulted in the petitioner not being prosecuted or convicted.[2] We reject the petitioner's claims and affirm the judgment of the court.

[1] General Statutes § 54-102kk provides in relevant part: "(a) Notwithstanding any other provision of law governing postconviction relief, any person who was convicted of a crime and sentenced to incarceration may, at any time during the term of such incarceration, file a petition with the sentencing court requesting the DNA testing of any evidence that is in the possession or control of the Division of Criminal Justice, any law enforcement agency, any laboratory or the Superior Court. The petitioner shall state under penalties of perjury that the requested testing is related to the investigation or prosecution that resulted in the petitioner's conviction and that the evidence sought to be tested contains biological evidence.

"(b) After notice to the prosecutorial official and a hearing, the court shall order DNA testing if it finds that:

"(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing;

"(2) The evidence is still in existence and is capable of being subjected to DNA testing;

"(3) The evidence, or a specific portion of the evidence identified by the petitioner, was never previously subjected to DNA testing, or the testing requested by the petitioner may resolve an issue that was never previously resolved by previous testing; and

"(4) The petition before the Superior Court was filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice.

"(c) After notice to the prosecutorial official and a hearing, the court may order DNA testing if it finds that:

"(1) A reasonable probability exists that the requested testing will produce DNA results which would have altered the verdict or reduced the petitioner's sentence if the results had been available at the prior proceedings leading to the judgment of conviction;

"(2) The evidence is still in existence and is capable of being subjected to DNA testing;

"(3) The evidence, or a specific portion of the evidence identified by the petitioner, was never previously subjected to DNA testing, or the testing requested by the petitioner may resolve an issue that was never previously resolved by previous testing; and

"(4) The petition before the Superior Court was filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice. . . ."

[2] The petitioner also claims that the trial court improperly relied on clearly erroneous facts in reaching its conclusion to deny the petition.

The record reveals the following facts underlying the petitioner's criminal conviction, as well as additional relevant procedural history. On March 21, 1999, a tenant at 17 Burton Street in Waterbury went to the basement of the building to retrieve his bicycle when he discovered the deceased and partially clothed body of the victim, Michelle McMaster. A police investigation determined that the victim had been asphyxiated by manual strangulation and found evidence consistent with sexual assault.

The perpetrator was not found, but in the years that followed the police came to suspect that a known drug user, Donna Russell, had information regarding the crime. Russell, who was associated with a group of known drug users that included the petitioner and the victim, did not cooperate with the police until January, 2008.[3] At that time, she told investigators at the Waterbury Police Department that she had been in the basement of 17 Burton Street on the evening of March 20, 1999, and observed the victim arguing with Lawrence Andrews regarding the victim's refusal to give Andrews either money or drugs. Russell also told the police that she

The court, in its memorandum of decision, adopted facts set forth by our Supreme Court in its decision affirming the petitioner's criminal conviction, which facts our Supreme Court concluded the jury reasonably could have found on the basis of the evidence presented at the petitioner's criminal trial. See *State* v. *Smith*, 313 Conn. 325, 328, 96 A.3d 1238 (2014). We summarily reject the petitioner's claim. The petitioner has cited no support, nor are we aware of any, for the proposition that this court may review or contradict the factual recitations of our Supreme Court. Rather, the contrary is true. See, e.g., *Martin* v. *Plainville*, 40 Conn. App. 179, 182, 669 A.2d 1241 (1996) (Appellate Court, as intermediate court, is barred from "reexamining or reevaluating Supreme Court precedent"), aff'd, 240 Conn. 105, 689 A.2d 1125 (1997).

[3] In January, 2008, Russell, who had been arrested for crimes unrelated to this appeal, was incarcerated in the York Correctional Institution in Niantic. Richard Baxter, a detective with the Waterbury Police Department, asked Russell if she would speak to him about the murder, to which she agreed. No promises or agreements were made in exchange for her statement. Russell gave the police three statements that resulted in the arrest of the petitioner. At the petitioner's criminal trial, Russell testified that her apprehension about cooperating with the police stemmed from her fear of retribution from Andrews, Daniel, and the petitioner, as well as her fear that her past would be exposed to her young children.

had observed the petitioner standing near the victim along with two other individuals, one of whom was later identified as Orenthain Daniel.

Russell told the police that the argument between the victim and the three men elevated to the point that the victim was knocked to the ground. Andrews then began to choke the victim, at which point Russell became frightened and fled. As she fled, she heard the victim gasping for air and pleading for help. She stated that she was afraid of Andrews and the other men, and that her fear caused her to ignore the victim's pleas for help. The last thing she saw as she left the basement was Andrews choking the victim, while the petitioner held the victim's arms down and Daniel pulled down the victim's pants. A short time later, outside of the basement, Russell encountered Andrews once again, during which time he threatened her and told her never to say anything about what happened in the basement. Russell also told the investigators that she was familiar with the petitioner and Andrews because they sold drugs in the neighborhood and she had previously purchased drugs from the petitioner many times.

In July, 2008, a few months after Russell's initial statement to the police, a DNA sample collected from a vaginal swab of the victim was found to match a DNA sample from Daniel. In March, 2009, the police showed Russell a photographic array from which she identified Daniel as the third man in the basement at the time of the murder. Only Daniel's DNA was recovered from the items that were collected and tested.

The police also obtained a statement from Norman Reynolds. Reynolds had used drugs with the petitioner in the early to mid-1990s, and his wife was the petitioner's first cousin. During the summer of 1999, Reynolds and the petitioner had been incarcerated at the Brooklyn Correctional Institution. On one occasion, the petitioner, after a visit from his girlfriend, seemed disturbed and paranoid, according to Reynolds. Reynolds stated that the petitioner later confided in him that he had killed the

victim but did not implicate anyone else. According to Reynolds, the petitioner stated that he was in the basement with Andrews and another man, Marvin Slade, and that the men had given the victim drugs in exchange for sex. After the encounter, the men left the basement. The petitioner later returned for more drugs or money but instead took drugs with the victim and attempted to have sex with her, once again, while wearing a condom. When the victim resisted his advances, the petitioner became frustrated and began punching and strangling the victim, which resulted in her death. Reynolds stated that the petitioner had told him that he did not intend to kill the victim and that her death was accidental.

In March, 2009, largely on the basis of the statements provided to the police by Russell and Reynolds, the petitioner was charged with felony murder and murder in violation of General Statutes §§ 53a-54a and 53a-54c, respectively. He entered a plea of not guilty and elected a jury trial. The jury deliberated for one day, during which it requested a playback of Russell's testimony. The jury found the petitioner guilty on both counts. The trial court merged the conviction[4] of the two offenses and rendered judgment, sentencing the petitioner to a term of sixty years of incarceration.

The petitioner appealed from his conviction and claimed that the trial court had improperly admitted evidence of uncharged sexual misconduct, rejected his claim that he was denied a fair trial, and permitted the prosecutor to exercise a peremptory challenge with respect to an African American venireperson in violation of United States Supreme Court precedent. *State* v. *Smith*, 313 Conn. 325, 328, 96 A.3d 1238 (2014). Our Supreme Court upheld the judgment of the trial court. See id., 360.

On August 14, 2023, the petitioner filed a petition pursuant to § 54-102kk (b) for postconviction DNA testing of fingernail scrapings that had been collected from

---

[4] We note that, after the petitioner was sentenced, our Supreme Court decided that vacatur rather than merger was the appropriate remedy for a defendant convicted of greater and lesser included offenses. See *State* v. *Polanco*, 308 Conn. 242, 255, 61 A.3d 1084 (2013); see also *State* v. *Miranda*, 317 Conn. 741, 745, 120 A.3d 490 (2015).

the victim's body as part of the police investigation.[5] In his petition, citing § 54-102kk (b) (1), the petitioner argued that "[t]here is a reasonable probability that, if exculpatory results had been or could have been obtained through DNA testing" of the fingernail scrapings, he would not have been prosecuted or convicted.[6] He argued that the absence of his DNA in the fingernail scrapings or the presence of a third party's DNA would be materially exculpatory considering the totality of the evidence in his case. The petitioner, who has always maintained his innocence, further argued in the petition that the state's case against him was "not so overwhelming as to counteract the persuasive value of exculpatory evidence." Ultimately, the petitioner wanted the court to conclude that DNA testing was warranted because it could reveal that the petitioner's DNA was not present under the victim's fingernails. The petitioner contends that this would be inconsistent with Russell's trial testimony that he was present in the basement and that she saw him holding down the victim's arms.

The court, *Klatt, J.*, held a hearing on October 30, 2023, during which the petitioner presented witnesses whose testimony established the existence of the fingernail scrapings and the ability to potentially recover DNA evidence from the scrapings.[7] The witnesses, however,

---

[5] Prior to the filing of his petition for postconviction DNA testing, the petitioner filed a petition for a writ of habeas corpus, which remains pending, and intended to use in that action any materially exculpatory DNA evidence in support of a claim of actual innocence. See *Smith* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, Docket No. CV-16-4008208-S.

[6] In its memorandum of decision denying the petition for postconviction DNA testing, the trial court found that, during the petitioner's criminal trial, he was offered the opportunity to have the fingernail scrapings tested for the presence of DNA but opted not to do so and that the state forensic laboratory did not test the evidence on its own, as that would have "exhaust[ed]" the sample. The court further found that "[a] letter was sent to both the state and the defense at the time of the scientific testing, [but] neither party pursued the matter further."

[7] During a brief colloquy with the petitioner's counsel, the trial court inquired whether counsel intended to argue the request for DNA testing under subsection (b) of § 54-102kk:

could not eliminate the possibility that any DNA samples tested might be too degraded for analysis. At the hearing, the prosecutor argued that the petitioner had not proven that "a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA results from scientific testing." See General Statutes § 54-102kk (b) (1). Additionally, the prosecutor argued that the petitioner's DNA was not expected to be found in the fingernail scrapings, and, in the prosecutor's opinion, the absence of the petitioner's DNA would not require a finding that the results were materially exculpatory.[8] The prosecutor conceded that the petitioner had met the remaining statutory requirements.

On December 7, 2023, the trial court denied the petitioner's petition, concluding that, "[b]ased on a consideration of the totality of the evidence that was presented at the [petitioner's] trial, the court cannot find that testimony concerning the absence [of the petitioner's] DNA, or the presence of an unnamed third party['s] DNA resulted in an unfair trial or that the court's confidence in the jury verdict would have been undermined." The court concluded that the petitioner had failed to meet his

"The Court: . . . I'm reviewing the statute. I just want to be certain that . . . you're going under . . . [§] 54-102kk (b).

"[The Petitioner's Counsel]: Yes.

"The Court: . . . Do you have a statute in front of you? All right, so I just want to be clear here. It says a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained for DNA testing. . . . As to the prosecuted part, obviously . . . that's something that's up to the state of Connecticut . . . . But, or convicted. I mean, DNA can be anywhere on anything at any time. The absence of DNA doesn't mean that you didn't do it. The presence of DNA doesn't mean that he did do it."

[8] In its pretrial memorandum of law in opposition to the petitioner's petition, the state argued that "Russell was the only eyewitness who testified. She testified that she saw the [petitioner] holding down the victim's arms while Andrews was choking her and Daniel was pulling down her pants. Daniel's DNA was found on the vaginal swab. Therefore, given these facts, the state does not expect the [petitioner's] DNA to be found on the fingernail scrapings. The presence of someone else's DNA would not mean or otherwise prove that he did not hold down the victim's arms."

burden of showing that DNA test results of the fingernail scrapings would have "[created] a reasonable probability that the [petitioner] would not have been prosecuted or convicted had that evidence been available at trial." This appeal followed.

We begin by setting forth our standard of review and relevant legal standards. "[T]he determination of whether a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing pursuant to § 54-102kk (b) (1) is a question of law subject to plenary review, while any underlying historical facts found by the trial court are subject to review for clear error. . . .

"[R]easonable probability within the context of § 54-102kk (b) (1) means a probability sufficient to undermine confidence in the outcome. . . . [T]he focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether [the unavailability] of the [exculpatory] evidence was so unfair as to undermine our confidence in the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Jeffrey G.*, 222 Conn. App. 411, 420–21, 305 A.3d 313 (2023) (citing *State* v. *Butler*, 129 Conn. App. 833, 21 A.3d 583, cert. denied, 302 Conn. 923, 28 A.3d 340 (2011)), cert. denied, 348 Conn. 936, 306 A.3d 1072 (2024); see *State* v. *Dupigney*, 295 Conn. 50, 62–64, 988 A.2d 851 (2010); see also *State* v. *Marra*, 295 Conn. 74, 88, 988 A.2d 865 (2010).

We disagree with the petitioner's claim that the trial court improperly failed to conclude that the petitioner would not have been prosecuted or convicted had exculpatory DNA evidence been admitted at trial.

In reviewing the petitioner's claim that exculpatory DNA evidence would result in a reasonable probability that the petitioner would not have been prosecuted or

convicted, our review is plenary, and "we must consider this evidence within the context of the entire trial." *State* v. *Butler*, supra, 129 Conn. App. 841; see also *State* v. *Marra*, supra, 295 Conn. 90 n.10 (reasonable probability analysis requires court to take into account totality of evidence adduced at trial to determine whether absence of exculpatory DNA evidence undermines confidence in jury's verdict). "In analyzing the effect of DNA evidence, § 54-102kk (b) (1) directs us to consider the effect of potential exculpatory results obtained through DNA testing. At this point, it is evident that the petitioner will not know with certainty what DNA testing will show. Thus, § 54-102kk (b) (1) requires the court to consider the effect of the most favorable result possible from DNA testing of the evidence . . . ." (Internal quotation marks omitted.) *State* v. *Jeffrey G.*, supra, 222 Conn. App. 421. In the present case, the petitioner argues that the DNA evidence derived from the victim's fingernail scrapings could "[exclude] the petitioner as the source of the DNA and/or [show] that one or more third parties were the source of the DNA . . . ." (Emphasis omitted.) We agree with the petitioner that this is the most favorable result of DNA testing and will, accordingly, assume that DNA testing would exclude the petitioner or show the presence of third-party DNA.

Additionally, this court has previously stated that "the hypothetical lack of DNA evidence on [a victim's] clothing does not create a reasonable probability that the petitioner would not have been prosecuted or convicted had that evidence been available at trial." *State* v. *Jeffrey G.*, supra, 222 Conn. App. 428. "DNA is not always detectable, meaning that it is possible to have someone touch an object but not leave behind detectable DNA because . . . some people leave more of their skin cells behind than others, i.e., some people are better shedders of their DNA than others. There are also other factors that affect the amount of DNA left on an object, such as the length of contact, the roughness or smoothness of the surface, the type of contact, the existence or nonexistence of fluids, such as sweat, and degradation on the

object." (Internal quotation marks omitted.) Id., 427; see *State* v. *Butler*, supra, 129 Conn. App. 840–41 (assuming that DNA testing of mask would reveal presence of third party's DNA would establish only that third party wore mask at some unknown point in time but would not establish that third party was involved in crime); see also *State* v. *Rosa*, 196 Conn. App. 480, 507, 230 A.3d 677 (sweatshirt found near scene of crime that contained DNA of known felon was not needed at trial for defendant to present third-party culpability defense), cert. denied, 335 Conn. 920, 231 A.3d 1169 (2020).

Subsection (b) (1) of § 54-102kk, unlike subsection (c), requires a petitioner to prove that "a reasonable probability exists that the petitioner would not have been *prosecuted* or *convicted* if exculpatory results had been obtained through DNA testing . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Jeffrey G.*, supra, 222 Conn. App. 420; see also footnote 1 of this opinion. The petitioner's claim that the absence of his DNA or the presence of another person's DNA in the victim's fingernail scrapings would have resulted in a reasonable probability that he would not have been convicted or prosecuted is unavailing for several reasons. First, the absence of the petitioner's DNA does not necessarily lead to the conclusion that the petitioner was not present at the murder scene, as it is within the realm of possibility that the petitioner held the victim's arms and simply did not leave any traceable amounts of DNA under her fingernails. Conversely, the presence of a third party's DNA would not reach the threshold either because the presence of third-party DNA under the victim's fingernails does not necessitate a finding that the petitioner either (1) did not hold down the victim as Russell testified or (2) was not present in the basement during the murder.[9] As this court stated in *Butler*, the presence of

---

[9] Whether the petitioner held one or both of the victim's arms is not material to the ultimate question of his guilt. The petitioner was charged with and found guilty of both felony murder and murder. See footnote 4 of this opinion. Even if we assume that exculpatory DNA evidence were presented that could have undermined the possibility

a third party's DNA could simply mean that the victim came into contact with another individual prior to her death. Such a finding would have little bearing on the ultimate question of whether a reasonable probability exists that the petitioner would not have been prosecuted or convicted had the DNA test results been admitted into evidence at his criminal trial.

The petitioner also argues that the DNA evidence would sufficiently undermine Russell's testimony. The DNA evidence, however, bears little relation to Russell's testimony. The petitioner argues that exculpatory DNA evidence would tend to prove that Russell's story was either fabricated or inaccurate. Exculpatory DNA evidence would not necessarily discredit Russell's testimony. Her testimony that she watched as the victim was held down by the petitioner may be just as compelling regardless of whether the petitioner's DNA was not found or another person's DNA was found in the fingernail scrapings. Ultimately, the petitioner is asking this court to make a credibility determination with respect to Russell's testimony, which was a task for the jury.

Additionally, the petitioner argues that the trial court was simply "tasked with determining whether the introduction of exculpatory DNA evidence would have undermined confidence in the verdict." Although it is true that the test for determining reasonable probability under § 54-102kk (b) (1) requires a determination of whether the lack of DNA evidence was unfair to the point that it " 'undermine[s] confidence in the jury's verdict' "; *State* v. *Marra*, supra, 295 Conn. 88; the ultimate question is still whether a reasonable probability exists that "the petitioner would not have been prosecuted or convicted had exculpatory evidence derived from DNA testing of the biological material been available at trial." Id., 90. With respect to that question and its underlying requirement, the petitioner has not presented sufficient evidence

that the petitioner had held the victim down at all, that still would not necessitate the conclusion that the petitioner was not present during the murder and did not participate in some capacity.

to establish a reasonable probability that potentially exculpatory DNA evidence would have resulted in the petitioner not being convicted or prosecuted had it been available at his criminal trial. Therefore, testing was not *required* under § 54-102kk (b).

The judgment is affirmed.

In this opinion the other judges concurred.