NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter.* *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| NEWTON PATRIC LAMBERT, | Court of Appeals No. A-11699 |
| Appellant, | Trial Court No. 1JU-10-551 CI |
| v. | |
| | **O P I N I O N** |
| STATE OF ALASKA, | |
| Appellee. | No. 2623 — November 16, 2018 |

Appeal from the Superior Court, First Judicial District, Juneau, William B. Carey, Judge.

Appearances: Michael Schwaiger, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Elizabeth T. Burke, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Allard, Judge, Coats, Senior Judge,[*] and Suddock, Superior Court Judge.[**]
[Mannheimer, Chief Judge, not participating]

Judge ALLARD, writing for the Court and concurring separately.

_____

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

[**] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

In 1982, Ann Benolken and her husband, James Benolken, were discovered brutally murdered in their Juneau apartment. Both victims had been sexually assaulted.

The physical evidence at the murder scene indicated that there were at least two perpetrators. The State charged Emmanuel Telles and nineteen-year-old Newton Patric Lambert as principals and accomplices in the murders. The two men were tried separately. At Lambert's trial, the jury convicted Lambert of Ann Benolken's murder but acquitted him of James Benolken's murder. Telles was acquitted of both murders at his later trial.

In 2010, almost thirty years after the Benolken murders, the Alaska legislature enacted a post-conviction DNA testing statutory scheme.[1] These statutes created a procedural mechanism through which defendants who claimed to be factually innocent of the crimes for which they were convicted could seek DNA testing of material physical evidence that could support their claim of innocence.[2] Lambert filed an application under the new statutes, seeking DNA testing of the only physical evidence remaining in his case — forensic samples of the blood and semen stains found on Mr. Benolken's clothing. Lambert argued that DNA testing of the blood and semen samples could lead to the identification of the true perpetrators of this double murder, thereby raising a reasonable probability that Lambert was wrongfully convicted of Mrs. Benolken's murder.

The State opposed the proposed DNA testing and the superior court ultimately denied Lambert's application, concluding that Lambert had failed to show that the proposed testing of blood and semen on *Mr.* Benolken's clothing could raise a reasonable probability that Lambert was not guilty of *Mrs.* Benolken's murder, given all of the State's evidence that directly linked Lambert to Mrs. Benolken's murder.

---

[1] *See* AS 12.73.010.090.

[2] *Id.*

For the reasons explained here, we affirm this ruling.

*Factual background and prior proceedings*

On April 6, 1982, a Juneau building manager entered the apartment of James and Ann Benolken due to a bad smell emanating from the apartment. Inside the apartment, the manager found the Benolkens' bodies. Both the husband and the wife had been sexually assaulted and violently killed.

Mrs. Benolken's body was found naked and lying face up on a bloody mattress on the floor. The mattress was saturated with blood, and there was blood spray extending six to seven feet up the wall at the head of the mattress. At trial, the medical examiner testified that Mrs. Benolken had been stabbed approximately sixty times. A broken piece of a knife was found beneath Mrs. Benolken's body, and strands of hair were found between her legs. To the immediate left of Mrs. Benolken's body was a void in the blood spatter. The State's expert later testified that this void was consistent with a person kneeling next to the body during the murder. A paper bag with a liquor bottle was found within arm's reach of where that person would have been kneeling. A single latent fingerprint was found on the paper bag. The fingerprint was later identified as belonging to Lambert.

Mr. Benolken's body was lying next to the bloody mattress, with his body bent over and his face lying on the mattress. Mr. Benolken's body was still clothed, and there was a bloodstain on his shirt and a semen stain on his pants. The medical examination indicated that both Mr. and Mrs. Benolken had been sexually assaulted.

The police investigated multiple suspects, but their investigation ultimately focused on Lambert.[3] In addition to Lambert's fingerprint on the paper bag, Lambert had

_____

[3] As part of his request for DNA testing, Lambert provided the police reports from the case. The police reports indicate that the police investigated a number of other suspects

(continued...)

also been seen by a Juneau police officer near the Benolkens' apartment on the morning after the murders occurred. Witnesses had also seen two dark-haired men with Mr. Benolken in the apartment building the night before the murders. (Lambert has dark hair.)

However, when Lambert was questioned by the police, Lambert denied having been near the building that morning. Lambert told the police that he had been drinking heavily the night before and had woken up in a cave under Gastineau Avenue. He claimed to have no idea how his fingerprint could have ended up on the paper bag found next to Mrs. Benolken's murdered body.

Shortly after his interview with the police, Lambert went to a friend, Gary Moses, and asked him to lie to the police on his behalf. Moses reported this conversation to the police, and Moses later testified to this conversation at trial. Moses's girlfriend, who was present during the conversation, corroborated Moses's account.

During the course of their investigation, the police also discovered that Lambert had gone to a local emergency room the day after the murder with a wound on his arm. At trial, the State introduced evidence that the wound could have either been caused by broken glass or by the broken knife found under Mrs. Benolken. (The Benolken apartment had a window with broken glass.) The State also introduced evidence that Lambert had bought a new knife a few days after the murder occurred.

The State introduced additional evidence from two jailhouse informants who testified that Lambert had confessed to them while he was in jail following his arrest on the murder charges. The first jailhouse informant, Robert Ewers, was housed with

---

[3] (...continued) including two men who allegedly confessed to murdering and raping the Benolkens, a man who allegedly confessed to "two homicides last night" the day after the bodies were discovered, various local drug dealers, and a Vietnam veteran who was implicated in the murders by an FBI informant.

Lambert at Ketchikan Correctional Center.  Ewers testified that Lambert confessed to stabbing Mrs. Benolken while his co-defendant, Emannuel Telles, killed Mr. Benolken. Ewers also testified that Lambert said that he had thrown the knife he used to kill Mrs. Benolken in the water.

The second jailhouse informant, Jeff Bowen, was housed with Lambert at Lemon Creek Correctional Center.  Bowen testified that Lambert confessed to stabbing and raping Mrs. Benolken while Telles raped and killed Mr. Benolken.  According to Bowen, Lambert said that he stabbed Mrs. Benolken to make her stop screaming while he raped her.  Bowen also testified that Lambert told him that he threw the knife in the channel after the murders.  (The Juneau police officer who saw Lambert near the Benolkens' apartment building on the morning of the murder testified that Lambert was in the general area where Lambert told Bower he threw the knife into the channel.)

Lastly, the State introduced the testimony of Michael Malone, an FBI expert on microscopic comparative hair analysis.  Malone testified that, in his expert opinion, the strands of hair found between Mrs. Benolken's legs came from an Alaska Native and the hair visually "matched" sample hairs taken from Lambert, who is Alaska Native. According to Malone, the visual match meant that there was only a one-in-five thousand chance that the strands of hair did not belong to Lambert.

(We note that the reliability of this expert testimony is seriously in dispute. Since the advent of DNA testing, microscopic comparative hair analysis has come under increased scrutiny, and there is now significant doubt as to its scientific reliability.[4]

---

[4]    *See* Spencer S. Hsu, *FBI admits flaws in hair analysis over decades*, THE WASHINGTON POST, (April 18, 2015), https://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches-in-nearly-all-criminal-trials-for-decades/2015/04/18 ("The Justice Department and FBI have formally acknowledged that nearly every examiner in an elite FBI forensic unit gave flawed testimony in almost all trials in which they offered evidence against criminal defendants over more than a two-decade period before 2000."); 

(continued...)

Agent Malone's expert testimony has been discredited in other cases, and there has been at least one case in which a defendant who was convicted based on Agent Malone's testimony has since been exonerated by DNA testing.[5] According to the record, Lambert is litigating the reliability of Agent Malone's testimony separately and that issue is not currently before us in this appeal.)

Lambert testified in his own defense at trial. In his trial testimony, Lambert admitted that he lied to the police about his whereabouts on the night of the murder, and he admitted that he was at the Benolkens' apartment when the Benolkens were murdered. Lambert testified that he had ingested cocaine, marijuana, amphetamines, LSD, and alcohol that night, and that he had a very limited memory of what had occurred. Lambert recalled having a seizure, seeing "red flashes," waking up in the Benolkens' bathtub, and discovering their murdered bodies in the living room. Lambert denied any involvement in the murders, although he testified that "[a]t one point [he] thought [he] might have done it."

---

[4] (...continued)
*see, e.g.*, *Pitts v. State*, 501 S.W.3d 803, 804-06 (Ark. 2016) (permitting defendant to seek relief via a writ of error coram nobis after determining that the tainted testimony of Malone was material to the defendant's conviction); *Horstman v. State*, 530 So.2d 368, 370 (Fla. App. Dist. 1988) (holding that the court does "not share Mr. Malone's conviction in the infallibility of hair comparison evidence. Thus, we cannot uphold a conviction dependent on such evidence.").

[5] *See, e.g.*, *Pitts*, 501 S.W.3d at 804-06; *Horstman*, 530 So.2d at 370; *see also* Geoff Earle, *Discredited ex-FBI agent hired back as a private contractor years later*, New York Post, (July 21, 2014), https://nypost.com/2014/07/21/discredited-ex-fbi-agent-hired-back-as-a-private-contractor-years-later/ ("Malone's criminal forensics work has come under heavy scrutiny by investigators — including his involvement in a case that sent former DC resident Donald Gates to prison for 28 years for a murder he didn't commit.").

During closing arguments, the State argued it had proven, beyond a reasonable doubt, that Lambert had killed Mrs. Benolken and had aided and abetted another person — either Telles or someone else — in killing Mr. Benolken. Lambert's attorney argued that the State had *failed* to prove beyond a reasonable doubt that Lambert was anything other than an innocent bystander to a brutal double murder committed by any number of other people.

After deliberating for two days, the jury convicted Lambert of first-degree murder for the intentional killing of Mrs. Benolken. However, the jury acquitted Lambert of killing Mr. Benolken. Lambert was sentenced to 99 years to serve.

Lambert's co-defendant, Emmanuel Telles, was later tried for the murders of Mr. and Mrs. Benolken at a separate trial. The jury acquitted Telles of both murders. A few years after these acquittals, Telles died.

Lambert appealed his conviction for Mrs. Benolken's murder to this Court. We affirmed Lambert's conviction and his sentence in an unpublished memorandum decision.[6]

*The enactment of Alaska's post-conviction DNA testing statutory scheme*

In 2010, almost thirty years after the Benolken murders, the Alaska legislature enacted AS 12.73, Alaska's post-conviction DNA testing statutory scheme. Under AS 12.73.010, a person convicted of a felony crime against a person under AS 11.41 may apply to the superior court for an order for DNA testing of physical evidence in their case.[7] The application must be filed in the court that entered the

---

[6] *See Lambert v. State*, 1985 WL 1078006, at *7 (Alaska App. Dec. 26, 1985) (unpublished).

[7] AS 12.73.010(a).

judgment of conviction, and a copy must be sent to the prosecuting authority responsible for obtaining the conviction.[8]

An application filed under AS 12.73.010 must specifically identify the evidence sought to be tested,[9] and it must include facts from which the court can make the findings required under AS 12.73.020.[10] The application must include, *inter alia*, an affidavit in which the defendant swears under oath that he or she is factually innocent of the crime for which they were convicted — *i.e.*, the person must swear under oath that they did not commit the crime for which they were convicted, nor did they commit any lesser included offense, solicit another person to commit the crime, or aid or abet another person in planning or committing the crime.[11]

Alaska Statute 12.73.020(7) requires that the defendant "identify a theory of defense that would establish the [defendant's] innocence."[12] Unlike its federal counterpart, Alaska's post-conviction DNA testing statute does not require this theory of defense to be consistent with the defense that was raised at trial.[13]

---

[8]   *Id.*

[9]   AS 12.73.010(b).

[10]   AS 12.73.020(1)-(11).

[11]   AS 12.73.010(b)(1)(A)-(B).

[12]   AS 12.73.020(7).

[13]   *See* Minutes of House Finance Comm., Senate Bill 110, at 2:16-2:21 (April 12, 2010) (amending the proposed bill to eliminate this consistency requirement on the ground that a factually innocent defendant should not be precluded as a matter of law from seeking DNA testing that could establish his innocence based on the strategic decisions that his defense attorney may have made at trial — decisions over which the defendant did not exercise direct control).

Alaska Statute 12.73.020(9) also requires the defendant to show, by a preponderance of the evidence, that:

> [t]he proposed DNA testing of the specific evidence may produce new material evidence that would
>
> > (A) support the theory of defense described in [AS 12.73.020(7)]; and
> > (B) raise a reasonable probability that the applicant did not commit the offense.[14]

Alaska Statute 12.73.020(7) and AS 12.73.020(9) work in concert and essentially require the defendant to explain two things: (1) *how* the proposed DNA testing could produce evidence that would be materially relevant to the defendant's guilt or innocence; and (2) *why* the DNA results, if favorable to the claim of innocence, would raise "a reasonable probability" that the jury would find reasonable doubt in this case where previously it had found none.

*Lambert's application*

Prior to the enactment of AS 12.73, Lambert filed an application for post-conviction relief alleging "newly discovered evidence" regarding the unreliability of Agent Malone's comparative hair analysis and seeking DNA testing of the hairs used in that analysis, as well as DNA testing of any other physical evidence still remaining from the case. After the new statutory scheme went into effect, Lambert's request for DNA testing was converted into an application for post-conviction relief under AS 12.73. In support of his application, Lambert submitted an affidavit attesting that he was factually innocent of Mrs. Benolken's murder. Lambert also requested discovery on whether there

---

[14] AS 12.73.020(9).

was any physical evidence still remaining in his case that could be tested. In response, the State provided documentation establishing that the evidence no longer existed.

Lambert's attorney continued to investigate what had happened to the evidence that had been sent to outside agencies for testing. Although most of this evidence had also been destroyed, Lambert's attorney discovered that a private crime laboratory in California still had physical evidence from the murders. This evidence consisted of blood and semen samples taken from stains on Mr. Benolken's clothing. These samples had been sent to the California laboratory at the request of Telles's attorney who had apparently considered having them tested. Although this testing had not occurred, the laboratory had still preserved the samples and they were therefore available for DNA testing.

Lambert filed a theory of defense, requesting DNA testing of the blood and semen samples. Lambert argued that the blood and semen samples should be tested to determine if the DNA belonged to James Benolken, Ann Benolken, Newton Lambert, or Emmanuel Telles. Lambert asserted that if the DNA results excluded Lambert, Telles, and the victims, then the results would support his theory of innocence — *i.e.*, the results would be consistent with his claim that two other persons (who were not Lambert or Telles) had killed the Benolkens. Conversely, if the blood and semen were determined to belong to the victims, Lambert, and/or Telles, then these results would be consistent with the State's theory of prosecution and could potentially confirm Lambert and/or Telles's guilt.

Lambert also asserted that testing the blood and semen could yield two different DNA profiles. Lambert posited that the semen could have come from the first man who raped and killed Mr. Benolken, while the blood could have come from the second man who killed Mrs. Benolken — the theory being that the second man injured

himself while stabbing Mrs. Benolken and then transferred his own blood onto Mr. Benolken's clothing when he assisted the first man in subduing Mr. Benolken.

Lambert also argued that if the DNA results excluded Lambert, Telles, and the victims as possible sources of the blood and semen, the results could be run through the national DNA database (CODIS[15]), which could lead to the identification and future prosecution of the true perpetrators of this double homicide.

The State opposed any DNA testing of the blood and semen samples. The State's initial concern was that the evidence had been contaminated.[16] The court held an evidentiary hearing on these concerns and ultimately concluded that it would not deny the proposed testing on these grounds alone.

The State also argued that Lambert had failed to meet the statutory requirements under AS 12.73.020(7). The State argued, in particular, that Lambert had failed to show how the proposed DNA testing would actually establish his innocence for purposes of AS 12.73.020(7).[17] The State also argued that Lambert was required to meet the three-part test articulated by this Court in *Osborne v. State*, and to show that the DNA testing would be conclusive on the issue of perpetrator identity.[18]

---

[15] CODIS is the generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases. *See* https://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet (last visited Nov. 7, 2018).

[16] *See* AS 12.73.020(5) (requiring court to find that "the evidence to be tested has been subject to a chain of custody and retained under conditions that ensure that the evidence has not been substituted, contaminated, or altered in any manner material to the proposed DNA testing").

[17] *See* AS 12.73.020(7).

[18] *Osborne v. State*, 110 P.3d 986 (Alaska App. 2005).

In addition, the State argued that Lambert had failed to show how the identification of two previously unidentified perpetrators based on evidence from *Mr. Benolken's* clothing would materially undermine the State's evidence linking Lambert to *Mrs.* Benolken's murder given the strength of that evidence.

The superior court agreed with the State that Lambert had failed to make an adequate showing under AS 12.73.020(7). Applying *Osborne*, the court found that Lambert failed to show that the DNA testing could conclusively establish his innocence.[19] The court also separately ruled that Lambert had failed to satisfy the statutory requirements under AS 12.73.020(9). The court concluded that, given the weight of the evidence against Lambert, the DNA results, even if favorable, would not raise a reasonable probability that Lambert was not guilty of killing Mrs. Benolken. The court therefore denied Lambert's application on these two grounds.

This appeal now follows.

### *The superior court erred in applying Osborne to Lambert's application*

On appeal, Lambert argues that the superior court misconstrued AS 12.73.020(7) and the court held Lambert to a higher standard than the statutory provision requires. Lambert also argues that the superior court erred when it structured its analysis around *Osborne v. State.*[20]

We agree with Lambert that the superior court's analysis of AS 12.73.-020(7) is flawed. We also agree that the superior court's reliance on the three-pronged test in *Osborne* was error.

---

[19]  *See id.* at 995.

[20]  *Osborne v. State*, 110 P.3d 986, 995 (Alaska App. 2005).

In the first part of its order, the superior court interpreted AS 12.73.020(7) as requiring Lambert to prove that the proposed DNA testing would conclusively establish his innocence. But Lambert's burden in relation to AS 12.73.020(7) was far more modest. Alaska Statute 12.73.020(7) requires the defendant to "*identif[y]* a theory of defense that will establish the defendant's innocence," but it does not require the defendant to prove that this theory is true or that the DNA testing will prove the theory true.[21]

As the State acknowledges on appeal, the defendant bears only a burden of pleading with regard to AS 12.73.020(7) — that is, the defendant is only required to identify his or her theory of innocence. Alaska Statute 12.73.020(9)(A) also requires the defendant to show how the proposed DNA testing could produce new material evidence that would "support" — *i.e.*, be consistent with — that theory of innocence. But neither statutory provision requires the defendant to prove that the DNA testing, if favorable, will "establish" his or her innocence or that the DNA testing will "conclusively" exclude the defendant as a possible perpetrator.

Instead of recognizing the limited showing required under AS 12.73.020(7) and AS 12.73.020(9)(A), the superior court appears to have conflated the statutory requirements with the three-pronged constitutionally based test we articulated in *Osborne*.[22] As Lambert correctly points out, *Osborne* was decided prior to the enactment of AS 12.73, and our decision in that case has been largely superseded by that subsequent legislation.

The question we faced in *Osborne* was whether, in the absence of any statutory right to post-conviction DNA testing, there was a free-standing constitutional

---

[21] AS 12.73.020(7) (emphasis added).

[22] *Osborne*, 110 P.3d at 995.

right to post-conviction DNA testing in cases involving claims of actual innocence.[23] We concluded that a defendant might have such a due process right if the defendant could meet the following three-part test: (1) his conviction rested primarily on eyewitness identification evidence; (2) there was a demonstrable doubt concerning the identification of the defendant as the perpetrator; and (3) scientific testing of the available evidence would likely be conclusive on this issue.[24]

When the Alaska legislature enacted AS 12.73, it did not adopt this three-part test. Instead, the legislature modeled Alaska's post-conviction statutory scheme after the federal Innocence Protection Act.[25] *Osborne* is therefore of marginal relevance to applications for post-conviction DNA testing and likely to simply muddy the analysis of claims brought under AS 12.73, as it did here.

*The superior court did not err when it concluded that the DNA testing, even if favorable, would not raise a reasonable probability that the outcome of Lambert's trial would be different*

To fulfill the statutory requirement under AS 12.73.020(9)(B), a defendant must show that the proposed DNA testing may produce new material evidence that would "raise a reasonable probability that the applicant did not commit the offense." Importantly, the defendant need not show any likelihood that the DNA results will actually be favorable to his claim of innocence. Instead, he need only show that, *assuming the results are as favorable as the defendant has shown they could be*, these

---

[23] *Id.*

[24] *Id.*; *see Osborne v. State*, 163 P.3d 973, 982 (Alaska App. 2007) (holding Osborne was unable to meet this three-part test).

[25] *Compare* 18 U.S.C. § 3600 (2004) *et seq. with* AS 12.73.010-090.

favorable results would raise "a reasonable probability" that the outcome of the defendant's trial would be different.[26]

The reasonable probability analysis requires the trial court to look at the trial record as a whole and to assess the potential evidentiary significance of these favorable DNA results in light of all the known evidence in the case.[27] This fact-intensive inquiry is probably best made by the trial judge who presided over the original trial.[28] In Lambert's case, however, the original trial judge is no longer available.

The term "reasonable probability" has a specialized legal meaning.[29] Reasonable probability means "a probability sufficient to undermine confidence in the

---

[26] *See State v. Armour*, 141 A.3d 381, 391 (N.J. App. 2016) ("Given the difficulty of anticipating the outcome of a DNA (or fingerprint) test, 'the trial court should postulate whatever realistically possible test results would be most favorable to [the] defendant'"); *State v. Peterson*, 836 A.2d 821, 827 (N.J. App. 2003) (emphasizing that a court may not deny a motion for DNA testing because the court finds it unlikely that DNA testing would produce favorable results; instead the court has to consider the evidential significance of whatever "favorable" DNA test results could be obtained).

[27] *See State v. Marra*, 988 A.2d 865, 874 (Conn. 2010) (reasonable probability analysis requires court to take into account totality of evidence adduced at original trial in order to determine whether absence of exculpatory DNA evidence undermines confidence in verdict).

[28] *See United States v. Jordan*, 594 F.3d 1265, 1269 (10th Cir. 2010) (noting that trial judge considering a motion for post-conviction DNA testing "is most often the judge who presided over the defendant's trial," and that this judge is "in a unique position to assess the evidence against the defendant and to evaluate whether new DNA testing may produce evidence which would raise a reasonable probability that [the defendant] did not commit the offense").

[29] *See* AS 01.10.040 (declaring that words and phrases "that have acquired a peculiar and appropriate meaning, whether by legislative definition or [judicial construction] shall be construed according to the peculiar and appropriate meaning").

defendant's conviction."[30]  A "reasonable probability" is "a reasonable chance and not merely an abstract possibility."[31]  Notably, the reasonable probability standard does not require a showing of more likely than not.[32]  Thus, a defendant need not show that the favorable DNA test results would likely result in an acquittal.  Instead, he is only required to show a "reasonable chance, not an abstract possibility" that the DNA test results, if favorable, would create a reasonable doubt where none had previously been found to exist.[33]

---

[30]  *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also Hood v. United States*, 28 A.3d 553, 564 (D.C. App. 2011) (applying *Strickland* "reasonable probability" standard to claim brought under federal Innocence Protection Act); *Richardson v. Superior Court*, 183 P.3d 1199, 1205 (Cal. 2008) (applying *Strickland* reasonable probability standard when construing comparable post-conviction DNA testing statute); *State v. Dupigney*, 988 A.2d 851, 859 (Conn. 2010) (same); *In re Towne*, 86 A.3d 429, 432 (Vt. 2013) (same).

[31]  *Richardson*, 183 P.3d at 1205.

[32]  *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Richardson*, 183 P.3d at 1205 (emphasizing that that a "reasonable probability" for purposes of obtaining post-conviction DNA testing "does not mean more likely than not") (citations omitted); *State v. Cote*, 21 A.3d 589, 593 (Conn. App. 2011) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). *See generally* Jed Handelsman Shugerman, *Unreasonable Probability of Error*, 111 Yale L. J. 435, 440 (2001) (explaining that courts have misinterpreted the "reasonable probability standard" to mean "more likely than not" when in fact the burden is less than that).

[33]  *Strickland*, 466 U.S. at 694; *Richardson*, 183 P.3d at 1205; *In re Towne*, 86 A.3d at 432 ("A petitioner must demonstrate that the evidence 'creates a reasonable doubt that did not otherwise exist.'") (internal citations omitted).

This is the same standard that is used to evaluate the prejudice prong of an ineffective assistance of counsel claim in federal law under *Strickland v. Washington*.[34] However, it is a higher standard than is used to evaluate the prejudice prong of an ineffective assistance claim in Alaska law under *Risher v. State*.[35] Under *Risher*, a defendant is required to show only that there is "a reasonable possibility" that the outcome of his trial would have been different but for his attorney's deficient performance.[36] This is a "less demanding" standard than the reasonable probability standard required here.[37]

The relative strength of the State's evidence and the importance of the evidence to be tested has clear import in analyzing whether the reasonable probability standard has been met in a given case.[38] Thus, in cases where the evidence to be tested could be dispositive on the question of the defendant's guilt or innocence, the strength of the State's evidence will be largely irrelevant. However, in cases where the evidence to be tested is only tangentially relevant to the defendant's guilt or innocence, the relative strength or weaknesses in the State's evidence will become more determinative of whether the standard has been met.

---

[34] *Strickland*, 466 U.S. at 694.

[35] *Risher v. State*, 523 P.2d 421 (Alaska 1974).

[36] *Id.* at 425.

[37] *State v. Jones*, 759 P.2d 558, 572 (Alaska App. 1988) (comparing the "reasonable possibility" standard to the "harmless beyond a reasonable doubt" standard used for constitutional errors under *Chapman*, with the critical distinction being that the defendant (not the State) bears the burden of showing the prejudice under this standard).

[38] *See In re Towne*, 86 A.3d at 435-36; *see also Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support").

One of the problems that Lambert faces in the current case is that the evidence he seeks to test is blood and semen found on Mr. Benolken's clothing, but Lambert was not convicted of Mr. Benolken's murder. The jury convicted Lambert only of *Mrs.* Benolken's murder, and the jury rejected the State's theory that Lambert had assisted another person or persons in killing Mr. Benolken. Thus, demonstrating that Lambert's DNA was not on Mr. Benolken's clothing would not directly undermine confidence in the jury's verdict.

Demonstrating that the DNA belonged to two unknown men (*i.e.*, not Lambert, Telles, or either of the victims) could potentially undermine confidence in the jury's verdict, but the significance of such a finding depends on the weight of the evidence directly linking Lambert to Mrs. Benolken's murder. Although the State's *primary* theory of prosecution was that only two men (Lambert and Telles) were involved in the murders, the forensic evidence suggested that more than two people may have been involved. This was a particularly brutal and violent double homicide that involved the murder and rape of two victims. In his arguments to the jury, the prosecutor emphasized that the person who killed Mr. Benolken — whether Telles or someone else — could not have done it alone. Lambert's defense attorney similarly argued that there could have been any number of people involved in the murders.

The question therefore becomes, if the DNA testing showed that there were two additional perpetrators who were involved in killing Mr. Benolken (neither of whom was Lambert and Telles), would these favorable test results raise a reasonable probability that Lambert was not involved in killing Mrs. Benolken? As the superior court noted, the "biggest problem" that Lambert faced in making this showing was that Lambert himself had admitted to being present at the Benolken apartment when the murders occurred. Lambert also admitted that "at one point [he] thought [he] might have done

– 18 – 2623

it." As the superior court also emphasized, the State's evidence linking Lambert to Mrs. Benolken's murder was strong. This evidence included not only Lambert's own admissions at trial, but also Lambert's out-of-court confessions to two different inmates in two different correctional facilities. The State's evidence also included (1) Lambert's fingerprint on a paper bag next to Mrs. Benolken's body and within arm's reach of where the person stabbing Mrs. Benolken would have been situated given the blood splatter; (2) the broken knife found under Mrs. Benolken's body and Lambert's purchase of a new knife a few days after the murders; (3) Lambert's visit to the emergency room to treat a wound that could have been caused by broken glass or the broken knife; and (4) Lambert's various lies to the police and his efforts to get his friends to lie to the police on his behalf.

On appeal, Lambert argues that the superior court erred in assuming that this evidence could not be controverted through other means. Lambert argues, in particular, that the superior court erred when it assumed that Lambert's trial testimony was true. According to Lambert, the superior court should have questioned the veracity of Lambert's trial testimony because his admissions bore all of the hallmarks of a false confession, in that they were admissions by a young defendant who was confronted with seemingly incontrovertible, but perhaps false, physical evidence — *i.e.*, Agent Malone's hair comparison analysis.

But Lambert never argued that his trial testimony was false in his application for post-conviction DNA testing. Nor did he ever claim that he was not present in the apartment at the time the murders occurred. He also did not refute any of the other evidence against him (other than asserting Agent Malone's general lack of reliability as an expert). Given all this, we conclude that the superior court did not err when it determined that Lambert failed to show that the proposed DNA testing, if

favorable, would raise a reasonable probability that the outcome of trial would be different — *i.e.*, a reasonable chance, not an abstract possibility, that reasonable doubt regarding Lambert's guilt would be found where none had previously existed. Accordingly, we uphold the superior court's denial of Lambert's application for post-conviction DNA testing.

*Conclusion*

The judgment of the superior court is AFFIRMED.

Judge ALLARD, concurring separately.

I write separately to point out that there is nothing preventing the State from DNA testing the evidence in this case for its own reasons. As the United States Supreme Court noted "DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty. It has the potential to significantly improve both the criminal justice system and police investigative practices."[1] Here, the jury's verdicts from the two defendants' trials have left the public with many unanswered questions about these brutal murders. How many people were involved in these murders? Was Telles involved? Was Lambert involved in killing Mr. Benolken as well as Mrs. Benolken? Testing the blood and semen from Mr. Benolken's clothing has the potential to provide answers to at least some of these questions. Moreover, if the results are matched to DNA profiles in the national FBI database CODIS, the testing could potentially lead to the identification and future prosecution of at least one (if not two) previously unknown perpetrator(s) from this thirty-year-old double homicide.

It is also worth noting that DNA testing is relatively inexpensive, generally costing no more than a few thousand dollars. In contrast, the costs of fully litigating the requirements under AS 12.73 can be quite high, consuming a significant amount of attorney, judge, and court time — most of which comes from public funds. Partially for this reason, the Alaska legislature has recognized the benefits of proceeding with the initial testing outside the formal requirements of AS 12.73 in certain circumstances. Alaska Statute 12.73.060 therefore provides:

> The provisions of this chapter do not prohibit an applicant and the prosecuting authority from agreeing to conduct post-conviction DNA testing without the person's filing an application under this chapter. The parties may also stipulate

---

[1] *Dist. Attorney's Office for Third Dist. v. Osborne*, 557 U.S. 52, 55 (2009).

> to the payment of costs for the DNA testing and other costs associated with the terms of the agreement.

One advantage of this approach is that the parties are not forced to speculate as to the universe of potentially exculpatory results. Instead, they can streamline the litigation and focus on the actual known results. Moreover, in cases where the specific evidence to be tested is particularly material to the question of guilt or innocence, there will likely be times when the DNA testing simply confirms the defendant's guilt, thereby obviating the need for costly litigation altogether.