138 Nev., Advance Opinion 11

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| MICHAEL PHILLIP ANSELMO,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 81382<br><br>FILED<br><br>MAR 10 2022<br>ELIZABETH A. BROWN<br>CLERK OF SUPREME COURT<br>BY_____<br>CHIEF DEPUTY CLERK |

Appeal from a district court order dismissing a postconviction petition for genetic marker analysis. Second Judicial District Court, Washoe County; Lynne K. Simons, Judge.

*Reversed and remanded with instructions.*

Holland & Hart LLP and Sydney R. Gambee, J. Robert Smith, and Jessica E. Whelan, Las Vegas; Rocky Mountain Innocence Center and Jennifer Springer, Salt Lake City, Utah,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Christopher J. Hicks, District Attorney, and Marilee Cate, Appellate Deputy District Attorney, Washoe County,
for Respondent.

BEFORE THE SUPREME COURT, CADISH, PICKERING, and HERNDON, JJ.

*OPINION*

By the Court, CADISH, J.:

This appeal presents issues concerning Nevada's statutory scheme governing postconviction petitions for genetic marker analysis. A

22-07625

jury convicted appellant of first-degree murder in 1972. In 2018, he filed a postconviction petition for genetic marker analysis, seeking to examine the DNA found on various pieces of evidence under a procedure that was not available at the time of his trial. The district court concluded that appellant failed to show a reasonable possibility that the State would not have tried him, or the jury would not have convicted him, had he obtained exculpatory evidence through the testing because the jury heard similar exculpatory evidence but nevertheless convicted him.

Under NRS 176.09183(1), the district court must assume that the requested genetic marker analysis will produce exculpatory DNA evidence and order such analysis if a reasonable possibility exists that the petitioner would not have faced prosecution or conviction had the exculpatory results been obtained before trial. Applying that statute to the facts here, we conclude that the district court acted outside the bounds of its discretion in denying appellant's petition, as the State tried appellant on a felony-murder theory based on rape and DNA evidence that would have excluded appellant as the perpetrator necessarily creates a reasonable possibility that he would not have faced prosecution or conviction for felony-murder.

Additionally, the existence or nonexistence of evidence relevant to the claims in the petition for genetic marker analysis necessarily impacts the district court's resolution of the petition. Thus, to the extent the custodian's inventory of evidence merely described the packaging holding the evidence in the State's possession, rather than the items of evidence contained therein, we agree with appellant that the inventory lacked sufficient detail for the district court to determine whether the evidence on which appellant sought testing existed. Consequently, appellant's motion

for relief as to the inventory should have been granted. Accordingly, we reverse the district court's order and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

The female victim disappeared from a hotel employee parking lot near the Cal-Neva Lodge at Lake Tahoe on July 15, 1971. Two days later, appellant Michael Anselmo found the victim's body and reported it to the police. The responding officers noted that the victim was nude. Several days later, Anselmo told the police where they could find the victim's jacket and keys, which the police recovered.

After conducting an autopsy, the coroner concluded that the victim died from strangulation. He further concluded that the perpetrator manually strangled the victim with his right hand. The perpetrator also stabbed the victim 15 times, which the coroner concluded was a contributing cause of death. The autopsy revealed evidence of sexual assault, and the coroner recovered semen from the victim. The semen did not contain any sperm, which indicated that either the male supplier was sterile or had a vasectomy, or the sperm degenerated before the victim's body was found.

Several officers interviewed Anselmo at different times. Throughout those interrogations, Anselmo asserted that another individual, John Soares, killed the victim. During an interview on July 18, Anselmo went into a comatose state and law enforcement transported him to the hospital. After the hospital discharged Anselmo, Detective Gordon Jenkins interrogated him. While Anselmo initially reaffirmed that Soares committed the murder, he eventually confessed to the crime. The State charged Anselmo with first-degree murder.

At trial, the State argued that Anselmo committed first-degree murder under the felony-murder rule. Specifically, the State introduced evidence that the victim had sexual intercourse between 12 and 24 hours

before her death and that, due to the timeline of her activities, the only time the intercourse could have occurred was shortly before the victim's death. The State emphasized that the victim was found nude and that "the facts scream out to tell [the jury]" that the victim "was murdered in the perpetration of rape." In support, the State introduced evidence that the victim had an inflamed cervix and the coroner recovered semen from the victim's vaginal cavity. The forensic pathologist testified that there was no sperm found in the semen, which could be due to either the degenerative nature of sperm or the sterility of the semen's supplier.

Alternatively, the State argued that Anselmo committed first-degree murder under a willful, deliberate, and premeditated theory. In support, the State introduced evidence that the perpetrator stabbed the victim in the neck and chest 15 times. It argued that the perpetrator forced the victim from the parking lot to the clearing where the police recovered her body, which showed the perpetrator had time to form premeditation. The State also introduced evidence that Anselmo had been lurking in the employee parking lot during the early morning hours the day before the victim went missing. It introduced evidence of a struggle occurring in the car that the victim was using that night. Finally, the State relied on the fact that Anselmo (1) knew the body's location; (2) knew the location of the victim's jacket and keys, which the perpetrator had tossed into Lake Tahoe; and (3) confessed to committing the crime.

Anselmo's primary defense theory was that John Soares murdered the victim. Anselmo testified that he saw Soares in Reno the day before the victim went missing. On the night the victim went missing, Anselmo stated that he played pool and other games at the Cal-Neva Lodge's lounge until 1 a.m. When he left the club, Anselmo testified that he

heard a scream and went to investigate it. He alleged that Soares emerged from the bushes near the Lodge, took Anselmo into the brush, and showed Anselmo the victim's body. Anselmo claimed Soares threatened him to keep quiet and directed Anselmo to throw the victim's coat into Lake Tahoe, which Anselmo conceded he did.

In support of this theory, Anselmo pointed to evidence that police in the Lake Tahoe area had received a report that Soares was in the area. In closing argument, Anselmo reminded the jury that he had consistently told police that Soares killed the victim. He argued his confession was both involuntary and inconsistent with the facts of the killing. Specifically, he pointed out that he confessed to choking the victim with her nylon shirt while the pathologist concluded that the perpetrator likely choked the victim with his right hand. He identified other inconsistencies, like the fact that he confessed to stabbing the victim 3 to 4 times, whereas the autopsy identified approximately 15 stab wounds, and the fact that his description of the knife did not match the actual stab wounds. Further, he argued that the fact that he could show police where he disposed of the victim's jacket and keys, but not the knife, supported his innocence because he claimed Soares told him to dispose of the jacket and keys, not the knife. Finally, he argued that he could not have been the source of the semen recovered because he was not sterile. The jury found Anselmo guilty of first-degree murder and sentenced him to life without the possibility of parole. The jury's verdict was a general verdict that did not indicate which theory of first-degree murder the jury relied on to convict Anselmo.

In October 2018, Anselmo filed a postconviction petition requesting genetic marker analysis of the victim's clothes, the victim's fingernail clippings, blonde hair found in the victim's car, and the rape kit. He argued that the testing, which did not exist at the time of trial, would create a reasonable possibility that the jury would not have convicted him because it would reveal that another individual killed the victim. The district court found that Anselmo met the procedural requirements of NRS 176.0918 and set a hearing on the petition, directing the agency having custody of the evidence to prepare an inventory of all evidence related to Anselmo's claims. After the evidence custodians filed several inventories, Anselmo moved for an order to show cause, arguing the inventories were insufficient because they failed to identify all the evidence in the State's possession. In particular, he asserted that the inventories described the packaging in which the evidence was stored, as opposed to the evidence itself, or that the inventories were otherwise vague.

The State opposed the motion to show cause, arguing that the statutory scheme did not require the evidence custodians to open sealed evidence and provide descriptions of the contents therein. The district court denied the motion, concluding that the inventories were sufficient and that Anselmo failed to provide authority showing the evidence custodians were required to identify to whom the evidence belonged or to what the evidence pertained at the time of the crime.

The district court held a hearing on the petition. Anselmo argued that exculpatory DNA evidence would have contradicted his confession in which he claimed to have had sex with the victim. Regarding judicial estoppel, he asserted that the statutory scheme does not prohibit individuals who confessed to the crime from seeking genetic marker

analysis. The State argued that the jury heard similar exculpatory evidence that another person committed the crime and still convicted Anselmo. The State asserted that overwhelming evidence supported the conviction, and thus, exculpatory genetic marker evidence would not create a reasonable possibility that Anselmo would not have been tried or convicted otherwise. It also contended that judicial estoppel applied because Anselmo confessed to committing the crime at a Pardons Board hearing in 2005.

The district court dismissed Anselmo's petition. It concluded that the jury heard similar exculpatory information when the pathologist testified that the semen may not have been from Anselmo. It further found that the felony-murder theory was secondary to the State's premeditated-and-deliberate-murder theory, and "[t]hus, the fact that Mr. Anselmo's DNA may or may not be found inside or on [the victim] is not of consequence." The court also observed that the jury found Anselmo guilty beyond a reasonable doubt after (1) hearing testimony about his suspicious behavior on the night the victim disappeared and during the searches and discovery of her body, (2) considering evidence as to his inconsistent statements to law enforcement and his knowledge of the location of the victim's belongings, and (3) considering his confession and corresponding argument that it was made involuntarily. The district court made no findings regarding the State's judicial estoppel argument.

## DISCUSSION

*The district court abused its discretion by denying Anselmo's petition because Anselmo demonstrated a reasonable possibility that he would not have been tried or convicted if exculpatory results had been obtained from the genetic marker analysis*

Anselmo argues that he satisfied the reasonable-possibility standard. Specifically, he asserts that the identity of the perpetrator is in question, as he denied that he was the perpetrator and he does not match

the description of the perpetrator that one of the victim's roommates gave. He also contends that the presumed presence of another individual's DNA creates a reasonable possibility that he would not have been tried or convicted because it (1) supports his contention that his confession was coerced and corroborates his earlier statements that another individual murdered the victim, (2) corroborates his testimony that he disposed of the victim's jacket and keys at the direction of the actual perpetrator, (3) gives the jury reason to believe his similarly exculpatory evidence, and (4) might contradict Soares's testimony that Soares was not in the Tahoe area at the time of the murder. We agree.

While we review an order denying a petition for genetic marker analysis for an abuse of discretion, NRS 176.09183(1) (providing that the district court must order genetic marker analysis "if the court finds" that the enumerated requirements are satisfied), we review questions of statutory interpretation de novo, *Washington v. State*, 132 Nev. 655, 660, 376 P.3d 802, 806 (2016). When interpreting a statute, we look to the statute's plain language. *Id.* If a statute's plain language is unambiguous, we enforce the statute as written. *Id.*

As relevant here, a court must order a genetic marker analysis if it finds that

> (a) The evidence to be analyzed exists;
>
> (b) Except as otherwise provided in subsection 2, the evidence was not previously subjected to a genetic marker analysis, including, without limitation, because such an analysis was not available at the time of trial; and
>
> (c) One or more of the following situations applies:
>
>> (1) A reasonable possibility exists that the petitioner would not have been

> prosecuted or convicted *if exculpatory results had been obtained through a genetic marker analysis* of the evidence identified in the petition . . . .

NRS 176.09183(1) (emphasis added). The plain language of the statute requires the district court first to assume that the genetic marker evidence would be exculpatory and then ask whether there is a "reasonable possibility" that the petitioner would not have been convicted or prosecuted in light of the exculpatory genetic marker evidence.[1] Such an interpretation is consistent with the statutory scheme, as the results of the genetic marker testing must be "favorable to the petitioner" for the petitioner to then move for a new trial based on newly discovered evidence, NRS 176.09187, and is consistent with other jurisdictions' interpretations of analogous statutes, *see, e.g., Lambert v. State*, 435 P.3d 1011, 1019 (Alaska Ct. App. 2018) ("Importantly, the defendant need not show any likelihood that the DNA results will actually be favorable to his claim of innocence. Instead, he need only show that, assuming the results are as favorable as the defendant has shown they could be, these favorable results would raise a reasonable probability that the outcome of the defendant's trial would be different." (emphasis and internal quotation marks omitted)).

The "reasonable possibility" standard is satisfied if there is "a real possibility that the [exculpatory] evidence would have affected the

---

[1]The governing statute does not require the petitioner to show, or even assert, that he is actually innocent of the crime. Instead, the petition need only explain "[t]he rationale for why a reasonable possibility exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through a genetic marker analysis of" the identified evidence. NRS 176.0918(3)(b).

result."[2] *Roberts v. State*, 110 Nev. 1121, 1132, 881 P.2d 1, 8 (1994) (emphasis and internal quotation marks omitted), *overruled on other grounds by Foster v. State*, 116 Nev. 1088, 13 P.3d 61 (2000); *cf. James v. State*, 137 Nev., Adv. Op. 38, 492 P.3d 1, 5 (2021) (concluding that a reasonable possibility does not exist "[w]hen the results of the analysis would be irrelevant to the State's theory of the crime or the defendant's defense"). The first theory the State proposed in closing arguments was felony murder based on rape. While the State also presented a willful, deliberate, and premeditated theory as an alternative, the jury returned a general guilty verdict. Thus, the jury could have convicted Anselmo on the felony-murder theory based on the rape of the victim. Therefore, genetic marker evidence that definitively excludes Anselmo as the supplier of the semen recovered from the victim creates a reasonable possibility that the jury would not have convicted Anselmo because it directly contradicts the State's felony-murder theory. Moreover, as Anselmo points out, genetic material recovered from under the victim's fingernails would allow a jury to infer that the victim fought back against the perpetrator and, if analyzed and shown to be exculpatory, would create a reasonable possibility that the jury would not have convicted Anselmo, as it supports the defense theory that another individual assaulted the victim.

The State's contrary arguments are not persuasive. While the State asserts that the jury considered and rejected similarly exculpatory evidence, the evidence it identifies is not the same as the presumed

---

[2]In analyzing whether this standard is met, we look at the actual charge of which the petitioner stands convicted, which is first-degree murder. No party has argued that we should look at whether Anselmo would have been prosecuted or convicted of *any* crime as opposed to the crime the State chose to prosecute and of which the jury convicted him.

exculpatory evidence the genetic marker analysis would produce. For example, the State points out that the pathologist testified that the semen *may not have been* Anselmo's due to the lack of sperm. But that testimony still allowed the jury to conclude that Anselmo *may have* provided the DNA, and indeed, the State argued that Anselmo was the source of the semen and that the sperm had simply degenerated. NRS 176.09183, however, requires the district court to assume that the DNA evidence would exclude Anselmo, and thus, the jury would have received evidence that the semen *was not* from Anselmo. Moreover, the fact that the State had other circumstantial evidence of Anselmo's guilt does not preclude a reasonable-possibility finding because the district court must ask only whether there is a real possibility that the jury would not have convicted Anselmo if it had exculpatory genetic marker testing results.[3]

---

[3]The State argues that the principle of judicial estoppel provides additional support for the district court's dismissal of Anselmo's petition because Anselmo allegedly took an inconsistent position in a Pardons Board hearing. Judicial estoppel applies if, among other things, the same party takes two different positions in judicial or quasi-judicial administrative proceedings. *Marcuse v. Del Webb Cmtys., Inc.*, 123 Nev. 278, 287, 163 P.3d 462, 468-69 (2007). However, the State provides no authority or analysis to support the proposition that a Pardons Board hearing is a quasi-judicial proceeding for purposes of applying judicial estoppel and instead assumes that it is. Because not every administrative hearing is quasi-judicial, *see State ex rel. Bd. of Parole Comm'rs v. Morrow*, 127 Nev. 265, 273-74, 255 P.3d 224, 229-30 (2011) (adopting the judicial functions test to determine when an administrative hearing is a quasi-judicial hearing), and it is not obvious that a Pardons Board hearing would qualify, we conclude that the State's argument is not cogent, and thus, we need not consider it, *Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) (concluding that this court need not address issues not cogently argued and supported by relevant authority).

*The district court abused its discretion when it concluded that the State's inventory was sufficient*

Anselmo argues that the State's inventory of the evidence was insufficient because it lacked sufficient detail to identify the evidence remaining in the State's custody. We agree to the extent that the inventory described the packaging of some of the items of evidence as opposed to the actual evidence contained within it.[4]

Reviewing the district court's interpretation of NRS 176.0918(4) de novo, *Washington*, 132 Nev. at 660, 376 P.3d at 806, we conclude that an inventory that describes only the packaging in which the evidence is contained, as opposed to the actual evidence, is insufficient. The purpose of making postconviction genetic testing available to a convicted felon is to evaluate evidence that may contain genetic marker information pertinent to the investigation and prosecution that led to the conviction, NRS 176.0918(1), and to that end, NRS 176.0918(4)(c)(2) requires the State to provide a detailed list "of all evidence relevant to the claims in the

---

[4]The State argues that we lack jurisdiction to review the district court order denying Anselmo's motion regarding the sufficiency of the inventory because (1) the inventory order is not a final judgment and (2) the evidence custodians are not parties to this appeal. Neither argument is persuasive. While the inventory order is not a final judgment, we may review "any decision of the [district] court in an intermediate order or proceeding, forming a part of the record." NRS 177.045. Further, because we have the statutory authority to review an order denying a petition for genetic marker testing, NRS 176.09183(6), we may likewise review this intermediate decision pertaining to the allegedly insufficient evidence inventory. Moreover, NRS 176.0918(4)(c) gives the district court the authority to order each evidence custodian to provide an inventory of all relevant evidence. Thus, should we conclude that the evidence inventories are insufficient, we can instruct the district court to exercise its authority over the evidence custodians to require that the custodians provide sufficiently detailed inventories of the evidence.

petition . . . that may be subjected to genetic marker analysis." Here, the inventory, while sufficiently detailed regarding some pieces of evidence, described the containers of other pieces of evidence as opposed to the evidence itself. For example, the inventory described some pieces of evidence as "small paper canister," "film canister," and "one cardboard 'FONDA ONE PINT U.S. LIQUID MEASURE' canister." The inventory as to those pieces of evidence does not satisfy the statutory directive to produce an inventory of relevant evidence that may be tested because the district court cannot determine what evidence is inside a "small paper canister" or "film canister" for purposes of evaluating its relevancy or whether it should be tested. Accordingly, the district court improperly denied Anselmo's motion for an order to show cause related to the insufficient evidence inventory. *See Club Vista Fin. Servs., LLC v. Eighth Judicial Dist. Court*, 128 Nev. 224, 228, 276 P.3d 246, 249 (2012) (noting that discovery orders are generally reviewed for an abuse of discretion); *cf. State v. Nye*, 136 Nev. 421, 423-25, 468 P.3d 369, 371-72 (2020) (holding, in the context of an inventory search, that an inventory was insufficient because it did not detail all the contents of the defendant's bag).

The State's contrary arguments are not persuasive. First, the crux of the State's argument is that there is no statutory requirement that evidence custodians must open or manipulate sealed containers until the district court orders testing of an item in that container. However, the district court can only order testing if it finds "[t]he evidence to be analyzed exists." NRS 176.09183(1)(a). The district court cannot determine whether relevant evidence exists if the inventory merely describes the evidence

container, e.g., "film canister," as opposed to the evidence itself.[5] Similarly, the State's argument that it need not open a sealed container until the court orders that item to be tested lacks merit, as such an interpretation would frustrate the detailed statutory scheme that requires the inventory after the petition meets the requirements and then allows a hearing for the court to determine exactly which, if any, pieces of evidence it should order to be tested. *See* NRS 176.0918(4)(c); NRS 176.09183(1)(a).

## *CONCLUSION*

When determining whether to grant a petition for genetic marker analysis under NRS 176.09183(1)(a), the district court must assume that the analysis will produce exculpatory evidence and then ask whether there is a reasonable possibility that the petitioner would not have been tried or convicted due to that exculpatory evidence. Further, an evidence custodian's inventory of evidence is insufficient if it merely describes the packaging in which evidence is contained as opposed to the evidence within. On the record before us, the district court abused its discretion by denying Anselmo's petition for genetic marker analysis because he showed a

---

[5]At oral argument before this court, the State expressed concern that opening the sealed items may affect the chain of custody. However, opening and testing of evidence in sealed containers does not break the chain of custody as long as the evidence custodians follow their established procedures for handling evidence. *See Burns v. Sheriff*, 92 Nev. 533, 534-35, 554 P.2d 257, 258 (1976) (concluding that the chain of custody was established when the arresting officer testified that he placed the evidence in a sealed and initialed envelope in the evidence locker, and the chemist testified that she retrieved the sealed envelope from the evidence locker, opened the envelope and tested the evidence within it, and then placed the evidence back in the evidence vault in a newly resealed and initialed envelope).

reasonable possibility that, assuming exculpatory results, the jury would not have convicted him. The district court also abused its discretion when it concluded the inventory was sufficient as to the items that were identified only by their packaging because such a description does not satisfy the statutory requirement for an evidence inventory. Accordingly, we reverse the district court's order and remand for further proceedings. Upon remand, the district court must instruct the evidence custodians to submit a new evidence inventory that details the evidence within the containers it previously identified but did not open. After the district court receives and reviews the new evidence inventories, it must order genetic marker analysis of any relevant evidence it concludes exists.

_____, J.
    Cadish

We concur:

_____, J.
Pickering

_____, J.
Herndon